Samuel Steven FIELDS, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2004–SC–000091–MR.

Supreme Court of Kentucky.

Oct. 23, 2008.

Rehearing Denied Feb. 19, 2009.

378

Emily Holt Rhorer, Thomas More Ransdell, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant.

Jack Conway, Attorney General, David A. Smith, Michael A. Nickles, Jr., Office of Attorney General, Criminal Appellate Division, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice CUNNINGHAM.

Appellant, Samuel Steven Fields, was convicted of murder and first-degree burglary and sentenced to death. He appeals to this Court as a matter of right, Ky. Const. § 110(2)(b), raising forty-nine allegations of error. For the reasons set forth herein, we affirm the judgment.

## Background

Appellant was convicted of the murder of Bess Horton. During the early morning hours of August 19, 1993, two Grayson police officers responded to a call from the duplex apartment of Elmer Pritchard. Pritchard rented the apartment from Bess Horton, whose own single-family home was located nearby.

When Officers Lindeman and Green arrived in the area, they noticed a light on at Horton's home and the garage door open. The storm window on the front porch had been removed and the window was open. The doors were locked and Lindeman went through the open window into Horton's bedroom. Inside, he found Horton's body lying on the bed. Her throat had been slashed and a knife had been buried into her right temple. He also found Appellant in the bedroom. In his possession, he had a small knife, some jewelry, and other items belonging to Horton. The knife, a small butter knife, had a broken tip. At trial, the Commonwealth argued Appellant used this knife to remove screws from a storm window at Horton's house.

Appellant was arrested at the scene but denied killing Horton. According to Appellant, he had been drinking heavily and consuming "horse tranquilizers" throughout the afternoon of August 18, 1993. He was accompanied by his girlfriend, Minnie Burton; Phyllis Berry; and other friends. After driving around Carter and Boyd Counties for several hours, Burton and Appellant returned to Grayson and headed for Appellant's mother's apartment. They continued drinking with Appellant's brother, John Fields, who also lived at the apartment.

Eventually, Burton and Appellant began fighting and Appellant started throwing furniture, knives, and other objects around the living room. Burton left, stating that she was going to her own residence. She also lived in the duplex owned by Horton and occupied by Pritchard. The testimony concerning what transpired after this point was conflicting.

Burton testified that she left the apartment because Appellant's behavior scared her. She headed towards her duplex apartment on Horton's property, but was unable to gain entry. Pritchard had locked the door because Horton was in the process of evicting Burton. Burton had lived rent-free in the duplex in exchange for running Horton's errands and chauffeuring her. The relationship had turned sour, however, and Horton had turned off the power and water in the duplex in an attempt to force Burton out. Thus, on the evening of August 18th, Burton was unable to gain entry into her apartment.

In light of this circumstance, Burton testified that she sat on the front porch of the duplex. Appellant arrived some time later with a knife in his hand and was making a loud commotion. He told Burton that he had killed his brother, John, though Burton also testified that she did not fully believe the claim (in fact, Appellant had not killed his brother). He then took Burton's keys and told her that he would get into the duplex, implying that he might break in. Burton left, leaving through the backyard of the duplex as Appellant went around the side to the front door. Unbeknownst to either Burton or Appellant, Elmer Pritchard had heard the noise outside and had called the police.

Burton testified that she went to the nearby home of her aunt and uncle, Bernice and Kenny Floyd, and told them about Appellant's claim that he had killed his brother. She used their telephone to call Phyllis Berry, but did not get through. She departed the Floyds' house and walked to the home of Mary Click, where she encountered her cousin, Kim Mayle. Mayle drove Burton back to Appellant's mother's apartment to see if John Fields was alright. Finding no one home, they returned to Click's house. Burton slept there until the next morning when police arrived to question her.

According to Appellant, he left the duplex and walked over to Horton's home to look for Burton. Appellant told police that Burton was angry with Horton for evicting her and that she wanted to rob her. Appellant claimed that when he arrived at Horton's residence, he saw the open window and entered the house through that opening. The bedroom had already been ransacked, so he began pocketing anything he could find. Appellant claims that he did not notice Horton's body on the bed until police arrived.

Appellant was tried before a Rowan Circuit Court jury and found guilty of murder and burglary. He was sentenced to death. On direct appeal, this Court reversed the judgment. *See Fields v. Commonwealth,* 12 S.W.3d 275 (Ky.2000). Appellant was retried upon change of venue to the Floyd Circuit Court. He was again convicted of murder and first-degree burglary and sentenced to death. It is from that judgment that he now appeals as a matter of right.

## Standard of Review

■ Appellant raises forty-nine issues for our review. In the interest of clarity, we have grouped these issues into categories. Several of these cited errors are unpreserved. Nonetheless, in light of the penalty imposed and pursuant to KRS 532.075(2), we review even unpreserved allegations of error. The standard of review for such unpreserved errors is:

> Assuming that the so-called error occurred, we begin by inquiring: (1) whether there is a reasonable justification or explanation for defense counsel's failure to object, e.g., whether the failure might have been a legitimate trial tactic; and (2) if there is no reasonable explanation, whether the unpreserved error was prejudicial, i.e., whether the circumstances in totality are persuasive that, minus the error, the defendant may not have been found guilty of a capital crime, or the death penalty may not have been imposed.

*Johnson v. Commonwealth,* 103 S.W.3d 687, 691 (Ky.2003), *citing Sanders v. Commonwealth,* 801 S.W.2d 665, 668 (Ky.1990).

## Jury Issues

### Scope of Voir Dire

Appellant alleges that he was denied a fair jury selection process. To support this contention, Appellant relies on four rulings of the trial court that limited the

parameters of voir dire: (1) the denial of Appellant's motion to use a juror questionnaire; (2) the denial of Appellant's motion to ask four specific questions concerning the death penalty; (3) the failure to grant alternate questioning of potential jurors during voir dire; and (4) the failure to grant adequate peremptory challenges. Upon a thorough review of the relevant portions of the record, we conclude that the jury selection in this case satisfied due process requirements.

■ Appellant sought to elicit background information from potential jurors through the use of an expanded juror questionnaire. According to Appellant, the fourteen-question form would help to identify areas where further questioning of a juror might be necessary. It posed open-ended questions such as: "What are your feelings and beliefs about the death penalty?" and "What type of case comes to mind as appropriate for the death penalty?"

■ A central purpose of voir dire is to give the trial court the opportunity to visually observe the demeanor and affect of a potential juror. The use of a juror questionnaire, particularly one which poses substantive questions, defeats this purpose. "While preliminary instructions acquainting the jury with the nature of the judicial process are perfectly proper, providing jurors in advance with specific questions they will be asked so they can prepare in advance to answer such questions is an abuse of voir dire which must not be tolerated." *Sanborn v. Commonwealth,* 754 S.W.2d 534, 546 (Ky.1988), *overruled*

*on other grounds by Hudson v. Commonwealth,* 202 S.W.3d 17 (Ky.2006). In denying the use of Appellant's proposed juror questionnaire, the trial court acted well within the scope of its discretion to control voir dire. *See St. Clair v. Commonwealth,* 140 S.W.3d 510, 531–32 (Ky.2004).

■ Appellant unsuccessfully moved the trial court to ask each prospective juror four questions concerning the death penalty.[1] Though these specific questions were rejected, Appellant was afforded the opportunity to meaningfully question prospective jurors about the death penalty. During individual voir dire, the trial court informed prospective jurors of the possible penalties in the case and inquired whether they could consider the entire range. Defense counsel was permitted to ask follow-up questions specifically concerning the death penalty and mitigation, as required by RCr 9.38. While counsel is entitled to question jurors on whether they can consider the entire range of penalties should a guilty verdict be returned, there is no "affirmative right to ask certain specific questions of prospective jurors." *Thompson v. Commonwealth,* 147 S.W.3d 22, 53 (Ky. 2004) (citation omitted). "The extent of direct questioning by counsel during voir dire is a matter within the discretion of the trial court." *Tamme v. Commonwealth,* 973 S.W.2d 13, 25 (Ky.1998). There was no abuse of that discretion in this case.

■ The trial court denied Appellant's motion to allow the Commonwealth and the defense to ask alternate questions during voir dire. RCr 9.38 does not set forth an order in which prospective jurors

1. The proposed questions were: (1) Do you have any feelings or beliefs, one way or the other about the death penalty?; (2) Have you ever discussed your feelings regarding the death penalty with your family, friend, or co-workers?; (3) Tell me briefly what your feelings are, if they are any different than what

you have already said?; (4) If you are on a jury, do you have any moral or religious or conscientious objections that would prevent you from considering the death penalty as a punishment and imposing it, if you believe it appropriate?

should be questioned, as Appellant asserts. Rather, decisions regarding the manner and scope of voir dire lie within the sound discretion of the trial court. *See Webb v. Commonwealth,* 314 S.W.2d 543, 545 (Ky. 1958). There was no abuse of that discretion.

■■■■■ Appellant requested eighteen peremptory challenges, but was given eleven. Pursuant to RCr 9.40, he was entitled to ten. "Whether to grant additional peremptory challenges is clearly within the discretion of the trial court." *Stopher v. Commonwealth,* 57 S.W.3d 787, 798 (Ky. 2001). We find no abuse of discretion in the trial court's refusal to grant eight additional peremptory challenges.

■■■■■ A capital defendant is entitled to a jury that can fairly consider the entire range of punishments. *Grooms v. Commonwealth,* 756 S.W.2d 131 (Ky.1988). It is well-settled that an adequate voir dire examination is mandatory to the seating of a fair and impartial jury in a death penalty case. *Morris v. Commonwealth,* 766 S.W.2d 58, 60 (Ky.1989). We have thoroughly reviewed the record in this case and are satisfied that no unfair restrictions were placed on Appellant's ability to adequately question potential jurors concerning their opinion about the death penalty.

### Voir Dire on Mitigation

■■■ Appellant claims that his constitutional right to a fair and impartial jury was violated when he was unduly restricted from questioning potential jurors about intoxication as a mitigating factor. Defense counsel sought to pose the following question to prospective jurors during individual voir dire: "Under the law of Kentucky, intoxication at the time of the offense is a mitigating circumstance. A mitigating circumstance is a reason to give a less severe penalty. Is intoxication a factor you, as a juror, would be able to consider in imposing a punishment, or is that not something you would be able to consider in imposing a punishment?" The trial court determined that the question attempted to commit the juror in advance to a certain theory or result. Instead, during individual voir dire, the trial court defined mitigation generally and asked prospective jurors if they could follow the instructions to consider mitigating evidence.

However, the trial court did permit questioning about intoxication during general voir dire. Defense counsel invited the panel to share their experiences "being around friends or family that were intoxicated." A fairly lengthy discussion ensued, wherein the panel discussed the effects of intoxication on personality and whether intoxicated persons should be held responsible for their actions despite the impairment. Defense counsel also asked if any panel member would be unable to hear evidence about intoxication or drug use because of negative experiences in the past. Finally, defense counsel inquired whether evidence of intoxication would "in any way impair your ability to sit and listen to the evidence and consider it in a way the Judge may instruct you to consider."

■■■■■ "[P]art of the guarantee of a defendant's right to an impartial jury is an adequate voir dire to identify unqualified jurors." *Morgan v. Illinois,* 504 U.S. 719, 729, 112 S.Ct. 2222, 2230, 119 L.Ed.2d 492 (1992). Nonetheless, it is within the trial court's discretion to limit the scope of voir dire. *Webb,* 314 S.W.2d at 545. "The test for abuse of discretion in this respect is whether an anticipated response to the precluded question would afford the basis for a peremptory challenge or a challenge for cause." *Hayes v. Commonwealth,* 175 S.W.3d 574, 583 (Ky.2005).

A similar allegation of error was made in *McQueen v. Scroggy*, 99 F.3d 1302 (6th Cir.1996). · Defense counsel for McQueen sought to pose the following question to the jury panel: "Under our situation of the law on drugs and alcohol, sometimes it can be used to mitigate the punishment, reduce the crime. Could you agree with that; understand how that could be?" The trial court refused to allow the question, finding that it implicated a legal standard. However, defense counsel was able to ask other questions designed to elicit jurors' attitudes toward alcohol and drugs, such as, "How do you feel about the use of alcohol?" and "Do you think that the use of drugs or alcohol could influence a person to do some act they otherwise would not do?" The Sixth Circuit found no abuse of discretion in the trial court's limitations: "McQueen had the opportunity to obtain helpful information with respect to the jurors' views of intoxication as a mitigating factor." *McQueen*, 99 F.3d at 1329.

The permitted voir dire in this case was of the same nature as in *McQueen* and was sufficient to satisfy Appellant's right to make inquiry. Defense counsel asked numerous open-ended questions regarding intoxication and alcohol that successfully elicited meaningful responses from several jurors. During the discussion, many jurors candidly offered their experiences with intoxication and revealed their personal attitudes toward alcohol. The limitations imposed by the trial court did not unduly restrict Appellant's ability to identify unqualified jurors. There was no abuse of discretion.

### Juror Admonition

■ Appellant claims that the trial court continually failed to adequately admonish the jury pool. During individual voir dire, the trial court admonished each

prospective juror not to discuss the case with anyone, but did not give any specific admonition to avoid media coverage. After the first day of trial, the trial court told the empanelled jury to avoid newspaper and television coverage of the case, but did not specifically mention radio coverage. Prior to another three day recess, the trial court simply told the jury that all prior admonitions still applied. Though the issue is unpreserved, Appellant now argues that these admonitions were insufficient and in violation of the mandates of RCr 9.70.

■ RCr 9.70 does not apply to the jury pool; rather, the admonitions required by the rule apply "only after the jury has been selected and sworn to try the case." *St. Clair*, 140 S.W.3d at 532. Furthermore, it was not error for the trial court to admonish the empanelled jury by reference. RCr 9.70 specifically permits such method.

■ Regardless, Appellant has not provided any indication that the jury conducted itself contrary to the admonition and, therefore, any supposed error is harmless. *See Salinas v. Commonwealth*, 84 S.W.3d 913, 917 (Ky.2002).[2] Moreover, a review of the record reveals that the trial court gave numerous, detailed admonitions throughout the course of this lengthy trial. Thus, while RCr 9.70 requires an admonition at each adjournment, "in the absence of some showing of misconduct, substantial compliance with [the rule] will suffice." *Commonwealth v. Messex*, 736 S.W.2d 341, 342 (Ky.1987). The error, if any, was undoubtedly harmless.

### Mistrial on Basis of Jury Taint

■ Prior to the commencement of voir dire, a prospective juror asked a bail-

---

**2.** Likewise, the fact that the trial court had been contacted by a local newspaper does not establish any misconduct or improper exposure on the part of the jury.

iff if "this was the case which had started the previous year." Apparently, this juror had heard about the trial on the radio. In response, the trial court dismissed the entire group of prospective jurors who were in the courtroom. Appellant moved for a mistrial, arguing that prospective jurors from the dismissed group might discuss the case with other potential jurors still on the panel.

A mistrial is an extraordinary remedy that should be granted only when manifestly necessary. *Skaggs v. Commonwealth,* 694 S.W.2d 672, 678 (Ky.1985). Appellant's claim is highly speculative. There is no indication that any of the dismissed jurors discussed the case with other panel members. The trial court made every effort to avoid any possible taint by dismissing the entire group. A mistrial was not warranted. *See Key v. Commonwealth,* 840 S.W.2d 827, 830 (Ky. App.1992) (affirming denial of a mistrial where movant's evidence was "nothing more than speculation that the juror knew [the defendant]").

### Strikes for Cause

Appellant challenges the trial court's rulings with respect to six jurors, claiming that it erred in striking four jurors and in refusing to strike two others. "A potential juror should be excused for cause only when the juror cannot conform his/her views to the requirements of the law and render a fair and impartial verdict." *Ratliff v. Commonwealth,* 194 S.W.3d 258, 266 (Ky.2006). *See also* RCr 9.36(1). With respect to capital cases in particular, a prospective juror must be struck for cause if his views of capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d

581 (1980). The decision whether to excuse a juror for cause lies within the sound discretion of the trial court: "[D]eference must be paid to the trial judge, who sees and hears the juror, in reviewing determinations of impropriety of challenges for cause." *Penman v. Commonwealth,* 194 S.W.3d 237, 252 (Ky.2006).

### Juror 34

Appellant claims that Juror 34 was improperly struck for cause. We have reviewed the individual voir dire of Juror 34 and find no abuse of discretion. Juror 34 expressed substantial reservations about sentencing a defendant to a term of imprisonment, stating: "Whether they're guilty or not guilty, I just don't think I could do it," and "[I] just couldn't live with myself if I had to send somebody to the pen." She repeated this sentiment no less than five times. When asked specifically about the death penalty, Juror 34 replied: "To tell you the truth, I don't know ... I just don't know if I could or not." Despite defense counsel's attempts to rehabilitate Juror 34, her responses, when read in their entirety, made evident her serious reservations about sentencing a defendant to a term of imprisonment or death. At no point did Juror 34 ensure the court that she would be able to consider the full range of penalties. Accordingly, the trial court did not abuse its discretion in excusing this juror for cause. *See Woodall v. Commonwealth,* 63 S.W.3d 104, 120 (Ky. 2001) (juror properly struck for cause who stated that he "didn't think" he could consider the death penalty).

### Juror 26

Appellant challenges the trial court's decision to remove Juror 26 for cause. At the outset of individual voir dire, Juror 26 stated that he could consider the entire range of penalties. However, as

questioning progressed, he expressed an inability to consider the death penalty. When specifically asked by defense counsel to explain this discrepancy, Juror 26 replied: "Well, I just—I thought about it, you know, and I just don't know. I thought about, you know, the four [penalties] that he was talking about there and the death penalty. I thought about it, and then after I thought about it, you know, I don't think so." After further questioning, Juror 26 again expressed his inability to impose the death penalty and stated that he would be unable to sign a verdict form recommending death should he be elected foreperson. When read in its entirety, Juror 26's responses evidence an inability to consider the entire range of penalties that would be included in the court's instructions. As such, he was properly excused for cause.

### Juror 27

▓ Juror 27 was properly disqualified due to his inability to consider the death penalty. He expressly stated during individual voir dire that he would "exclude [the death penalty] automatically." When defense counsel attempted to rehabilitate this juror by explaining that he was only required to *consider* the death penalty, he stated, "We (the jury) can discuss it, but that still won't change my mind."

▓ "[T]he Commonwealth is entitled to have excused for cause a person who has such conscientious objection to the death penalty that he would never, in any case, no matter how aggravated the circumstance, vote to impose the death penalty." *Grooms,* 756 S.W.2d at 137. Juror 27 made clear his inability to consider the death penalty in any circumstance, even if the court instructed him to do so. He was properly excused for cause.

### Juror 86

▓ Appellant argues that Juror 86 was improperly struck for cause. The trial court determined that Juror 86 was substantially impaired in his ability to consider the entire range of penalties. We agree with Appellant that Juror 86 gave contradictory responses that did not clearly articulate his feelings about the death penalty. At the outset of questioning, he told the trial court that he would be able to consider the entire range of penalties, but later responded that he "didn't believe" he could impose the death penalty. He repeated this sentiment at least three times. While this juror's responses may have been inconsistent at times, we find no abuse of discretion in the trial court's decision to disqualify this juror. *See Patton v. Yount,* 467 U.S. 1025, 1039, 104 S.Ct. 2885, 2893, 81 L.Ed.2d 847 (1984) ("Jurors thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially.").

### Juror 17

▓ Appellant also claims that the trial court improperly refused to strike Juror 17 due to her inability to consider the minimum sentence. Indeed, when questioned by defense counsel about the proper punishment for an intentional murder, she stated, "I would feel it would have to be life without parole for twenty-five years or death if it got to that point." However, Juror 17 also stated that she would be able to follow all of the court's instructions; that she would keep an "open mind"; and that she would "have to hear the evidence before [she] could actually pick [a punishment]." In fact, when specifically asked by defense counsel whether she would consider a punishment other than death, Ju-

ror 17 replied, "You got the options, and that's what you've got them for, is to consider them all."

■ When Juror 17 expressed a preference for a harsher punishment, it was in response to defense counsel's hypothetical examples. Such responses are not determinative of a juror's ability to be fair and impartial:

> [A] juror is often presented with the facts in their harshest light and asked if he could consider imposition of a minimum punishment. Many jurors find it difficult to conceive of minimum punishment when the facts as given suggest only the most severe punishment.... The test is not whether a juror agrees with the law when it is presented in the most extreme manner. The test is whether, after having heard all of the evidence, the prospective juror can conform his views to the requirements of the law and render a fair and impartial verdict.

*Mabe v. Commonwealth,* 884 S.W.2d 668, 671 (Ky.1994).

Juror 17's responses throughout the voir dire examination made clear her willingness to consider all punishments, to follow the court's instructions, and to consider all the evidence presented. The trial court did not abuse its discretion in refusing to strike this juror for cause.

*Juror 43*

■ The trial court did not err in overruling Appellant's motion to strike Juror 43 for cause due to her employment as a paralegal in the Floyd County Commonwealth Attorney's Office. Juror 43 was unequivocal in her willingness to follow the court's instructions and to consider the entire range of penalties. She stated on numerous occasions her desire to "be as fair as I know how to be."

In *Randolph v. Commonwealth,* a juror failed to reveal her employment with the Commonwealth's Attorney during voir dire, even though questions designed to elicit such information were posed by defense counsel. In reversing the conviction, we held, "[i]t is obvious that an implied bias challenge lies against juror Miller because her position as secretary for the Commonwealth's Attorney gives rise to a loyalty to her employer that would imply bias." 716 S.W.2d 253, 255 (Ky.1986). Still, the trial court "must determine the existence of bias based on the particular facts of each case." *Id.* In *Randolph,* this Court concluded there were reasonable grounds to believe that the juror could not render a fair and impartial verdict.

The facts of this case differ significantly. Juror 43 readily provided that she worked for the Floyd County Commonwealth Attorney's Office and defense counsel was given the opportunity to question her about her employment and loyalties. *Cf. Randolph,* 716 S.W.2d at 256 ("A verdict is improper when a peremptory challenge is not exercised by reason of false information."). Unlike in *Randolph,* Juror 43 was not employed by the Commonwealth's Attorney who was prosecuting the case.[3] She confirmed that she had absolutely no prior knowledge of Appellant's case. *Cf. Randolph,* 716 S.W.2d at 255 ("In addition it is entirely possible that she may have been in a position to have known about the case prior to trial.").

■ In light of these circumstances, we do not believe that Juror 43 should have been removed for cause solely due to her employment. Police officers and other law enforcement officials are not disquali-

---

**3.** The Carter County Commonwealth's Attorney tried the case. This juror worked in the Floyd County Commonwealth Attorney's Office.

fied to serve as jurors in criminal cases solely on the basis of their employment. *Sholler v. Commonwealth*, 969 S.W.2d 706, 708 (Ky.1998). *See also Woodall*, 63 S.W.3d at 118 (juror's employment with the Kentucky State Penitentiary not cause for disqualification). Similarly, Juror 43 should not have been excused due only to her position in a Commonwealth Attorney's Office that was in no way involved in Appellant's prosecution. She gave no indication that she was unable to render a fair and impartial verdict based on the evidence or that she was unable to follow the court's instructions. As such, there was no error.

### Sequestration of Jury

Appellant argues that the jury should have been sequestered during the thirty-six hour period between the return of the guilty verdict and commencement of the penalty phase proceedings. Contrary to Appellant's assertions, "RCr 9.66 does not require that jurors be sequestered between the guilt and penalty phases of the trial. Sequestration is required only after a felony case has been submitted to a jury for its verdict." *Bowling v. Commonwealth*, 873 S.W.2d 175, 182 (Ky.1993). It was within the trial court's discretion not to sequester the jury between the guilt and penalty phases, which neither party requested. There was no error.

### Definition of Aggravating Circumstances

During individual voir dire, the trial court gave the following definition of aggravating circumstances to each prospective juror: "Aggravating evidence is evidence about a person's character, background or circumstance that may be considered as a reason for imposing a more severe punishment than might otherwise be imposed." Though no contemporane-ous objection was made, Appellant now argues that this definition is a misstatement of the law and that it impaired the jury's ability to consider his mitigating evidence.

The trial court's definition of aggravating circumstances is, at best, nebulous. The statutory aggravating factors enumerated in KRS 532.025(2)(a) relate to the defendant's prior criminal history, the status of the victim, and the circumstances of the crime. The trial court's definition, instead, gave the erroneous impression that evidence of Appellant's character, his *general* background, and his *personal* circumstances would be considered as aggravating circumstances. We have recognized that a trial court may consider nonstatutory aggravating circumstances that, under certain circumstances, might be characterized as evidence about the defendant's "character, background or circumstance." However, in this case, the jury was instructed solely on the aggravating circumstance found at KRS 532.025(2)(a)(2): "[t]he offense of murder or kidnapping was committed while the offender was engaged in the commission of . . . burglary in the first degree."

Further, we find no indication that Appellant was prejudiced by the trial court's definition of aggravating circumstances. The jury unanimously found that Appellant had murdered Bess Horton during the commission of a burglary. This finding was supported by substantial evidence, including the significant fact that Appellant was arrested in Horton's home with her valuables in his pockets. For this reason, we do not believe that the jury would have recommended a lesser punishment had the trial court provided a more accurate definition of aggravating circumstances during individual voir dire. Furthermore, we find no grounds for concluding that the jury's ability to consider Appellant's mitigating

evidence would have been impaired by this error. Accordingly, reversal is not warranted. *See Johnson*, 103 S.W.3d at 691.

### Evidentiary Claims

*Limits on Cross–Examination of Lindeman and Dobson*

Appellant's primary evidentiary claim is that he was improperly limited in his cross-examination of Officer Lindeman and Jason Dobson. Appellant was not permitted to question these witnesses about their criminal histories in order to attack credibility and reveal potential bias. A brief factual recitation is necessary to a full understanding of this claim.

Officer Lindeman discovered Appellant in Horton's home, arrested him, and heard his confession. After Appellant's first trial, but before his conviction was reversed by this Court, Officer Lindeman was charged in Carter District Court with misdemeanor counts of official misconduct, unlawful transaction with a minor, and harassment. The charges resulted in a pre-trial diversion agreement and the loss of his job.

Jason Dobson was employed as an EMT in Ashland and treated Appellant for abrasions to his arm immediately following his arrest. Following Appellant's first trial, but before the conviction was reversed, Dobson pled guilty to fourth-degree assault of a patient in police custody. He also lost his job.

■ We turn first to Lindeman's testimony, which was particularly important because Appellant made the following confession to him: "Kill me, Ron, just kill me. I stabbed her and I'm into it big time this time." Appellant argues that Lindeman's subsequent guilty plea to official misconduct reflects on his credibility. Further, because Lindeman did not enter his guilty plea until after Appellant's retrial had

been ordered, one could infer that he forged a good relationship with the Commonwealth in return for favorable testimony at the retrial.

Appellant recognizes that KRE 609(a) bars the introduction of Lindeman's conviction of misdemeanor crimes, but argues that a charge of official misconduct bears upon his credibility and was, therefore, admissible pursuant to KRE 608(b). The decision to admit specific instances of conduct concerning a witness' character for truthfulness rests within the sound discretion of the trial court. *See* KRE 608(b). *See also Purcell v. Commonwealth*, 149 S.W.3d 382, 398 (Ky.2004). That discretion was not abused in this instance. The claim that Lindeman curried favored with the Commonwealth by favorably testifying in Appellant's case is purely speculative and supported by no evidence. Furthermore, the claim is completely undermined by the fact that Lindeman's testimony did not differ from the testimony he gave at Appellant's first trial, before he was charged with the misdemeanor counts. *See Davenport v. Commonwealth*, 177 S.W.3d 763, 769 (Ky.2005) ("[R]eviewing courts have found reversible error when the facts clearly support an inference that the witness was biased, and when the potential for bias exceeds mere speculation."). The trial court did not exceed its broad discretion in limiting cross-examination of Lindeman. *See Commonwealth v. Maddox*, 955 S.W.2d 718, 721 (Ky.1997).

■ Dobson testified about statements that Appellant made to him while he was being treated for minor abrasions to his arm. According to Dobson, he asked Appellant where he was wounded and Appellant responded that he was not hurt. When Dobson asked where all the blood came from, Appellant told him "if you had killed some lady you would have blood on you too."

Defense counsel sought to cross-examine Dobson about his conviction for assaulting a patient. At his first trial, Appellant testified that Dobson physically accosted him and "baited" him into a confession. Defense counsel argued that Dobson's later assault conviction was admissible to support Appellant's claim.

■ Again, Dobson's misdemeanor assault conviction was not admissible pursuant to KRE 609. Furthermore, the trial court did not abuse its discretion in refusing to admit this testimony pursuant to KRE 608(b). Assault is not a crime which reflects upon "a witness' character for truthfulness or untruthfulness[.]" KRE 608(b)(1). More important, however, is that Appellant did not testify at his second trial, nor was his prior testimony admitted. Therefore, the jury never heard Appellant's allegation that Dobson attacked him and defense counsel had no reason to bolster this claim. For this reason, even if error occurred, Appellant was not prejudiced.

### Exclusion of Testimony Regarding Contents of Horton's Vehicle

■ James Craig, an employee of Horton, testified at Appellant's first trial, but was unavailable at the second trial. His testimony was read into the record. However, over defense objection, the trial court redacted portions of the testimony concerning Horton's vehicle. In the redacted portion, Craig testified that he found car keys, beer cans, and marijuana seeds in the vehicle after Horton's death. Defense counsel sought to elicit the same testimony from Elmer Pritchard, another Horton employee. Again, the testimony was excluded.

Appellant now argues that the trial court's exclusion of this testimony denied him the right to fully present his defense; that is, that Minnie Burton, who had access to Horton's car, killed Horton. According to Appellant, this testimony tended to prove that Burton used the keys to enter Horton's home and then threw them into the car on her way out. Also, defense counsel argued this testimony supported the theory that Horton had evicted Burton after learning that there were alcohol and drugs in her car.

We agree with the trial court that the testimony was irrelevant. Craig and Pritchard both testified that multiple persons had access to Horton's car. No other evidence was proffered to prove that Burton was the last person to drive the car or that the beer cans and marijuana seeds belonged to her. Indeed, as the trial court noted, there was no evidence linking any particular individual to the vehicle, and the vehicle was in no way tied to the crime. In short, testimony that beer cans and a set of keys were found inside Horton's car did not tend to make any relevant fact more or less likely. *See* KRE 401. There was no error.

### Exclusion of Kimmel Testimony

■ Vince Kimmel was an acquaintance of Burton and Appellant who claimed that Burton once confessed to him that she had committed the murder. Prior to trial, however, Kimmel was involved in a serious car accident that rendered him incompetent to testify. In light of his unavailability, defense counsel sought to introduce a recorded statement Kimmel made to defense investigators. The trial court refused because Kimmel had not been subject to cross-examination by the Commonwealth and his statement contained hearsay.[4]

---

4. A factual dispute arose about Kimmel's statement. According to defense counsel,

Kimmel stated that Burton confessed to him. The Commonwealth indicated to the trial

■ Appellant argues that this ruling unduly restricted his right to present a defense, thus, violating his due process rights. The Sixth Amendment guarantees a criminal defendant's right to present a defense, which includes evidence that someone else committed the crime. *Beaty v. Commonwealth,* 125 S.W.3d 196, 207 (Ky.2003). However, evidence is not admissible simply because it would tend to prove that another person was the perpetrator; and criminal defendants' due process rights are not violated by every limitation placed on the admissibility of evidence. *Beaty,* 125 S.W.3d at 208. Rather, the exclusion of evidence violates a defendant's constitutional rights when "it significantly undermine[s] fundamental elements of the defendant's defense." *United States v. Scheffer,* 523 U.S. 303, 315, 118 S.Ct. 1261, 1267–68, 140 L.Ed.2d 413 (1998).

Such was not the case here. The evidence sought to be introduced contained inadmissible hearsay evidence. *See* KRE 801; KRE 804. Furthermore, had Kimmel been available as a witness, the Commonwealth indicated that it would have cross-examined him regarding his criminal background, mental health issues, and substance abuse. Because the recorded statement was not subject to cross-examination, it bore little indicia of reliability. The trial court enjoys broad discretion in decisions concerning the admissibility of evidence, and we find no abuse of discretion in this instance. *See Olden v. Commonwealth,* 203 S.W.3d 672, 677–78 (Ky.2006).

■ Nor do we believe Appellant was wholly prevented from presenting his defense theory that Burton committed the murder, and his reliance on *Chambers v. Mississippi* for this assertion is misplaced.

410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973). *"Chambers* holds that application of evidentiary rules cannot be applied so as to completely bar all avenues for presenting a viable defense. It does not hold that evidentiary rules cannot be applied so as to properly channel the avenues available for presenting a defense." *Mills v. Commonwealth,* 996 S.W.2d 473, 489 (Ky.1999). Throughout the trial, defense counsel ably injected the possibility that Burton committed the crime. Significantly, Burton's supposed confession was elicited from two other testifying witnesses. Appellant's defense was not unduly thwarted by the trial court's ruling with respect to Kimmel's recorded statement.

### Sexton Testimony

■ Appellant argues that the trial court improperly prohibited him from impeaching Cindy Sexton with a prior inconsistent statement. Following Horton's murder, Sexton was interviewed by Detective Stevens and revealed a conversation she once had with Appellant and Burton. During this conversation, Appellant and Burton discussed robbing Horton and even invited Sexton to participate. Later, Sexton was interviewed by Gary Sparks, an investigator for the defense. According to Sparks' notes, Sexton stated that Appellant and Burton also discussed physically harming or killing Horton during the conversation. At trial, Sexton testified that the conversation related only to robbing Horton. She further testified that she had given "pretty much the same story" to both Sparks and Detective Stevens.

Defense counsel sought to impeach Sexton's testimony that she had given the same statement to both Sparks and Detec-

court that Kimmel told its investigator that he heard about Burton's confession from a third party.

tive Stevens. The trial court overruled defense counsel's motion to introduce Sparks' investigative report, determining that the report contained inadmissible hearsay. However, defense counsel was permitted to recall Sexton during its case-in-chief to refresh her memory of the conversation she had with Sparks. She testified that she did not recall telling him that Appellant and Burton discussed harming Horton. Defense counsel then called Sparks. Upon questioning, he testified: "[Sexton] stated that Minnie stated to her that on—not on one occasion, but on several occasions, that the old lady ought to be killed."

Assuming arguendo that the trial court erred in excluding Sparks' investigative report as substantive evidence, the error was undoubtedly harmless. An error is harmless "if there is no reasonable possibility that it contributed to the conviction." *Anderson v. Commonwealth*, 231 S.W.3d 117, 122 (Ky.2007). Here, the jury was aware that Sexton gave slightly differing statements to Sparks and Detective Stevens. The jury also learned the substance of Sexton's conversation with Sparks and her allegation that Appellant and Burton discussed harming Horton in addition to robbing her. As the substance of Sparks' report was fully revealed through his testimony, we discern no possibility that the result would have been different had the report itself been admitted. The error, if any, was harmless.

### Rebuttal Testimony by Detective Cales

In 2002, following Appellant's first trial, Norma Sloas contacted the Attorney General's Office and related a conversation she had with Minnie Burton in 1996. According to Sloas, Burton stopped by her house while she was sitting on the front porch. Burton told her that she had killed Bess Horton. Burton also warned Sloas not to repeat the confession to anyone. At trial, Sloas testified to the same facts. However, she added that Burton was accompanied by her cousin, Kim Mayle, who left before Burton made the supposed confession.

At trial, the Commonwealth called Detective Cales, who had interviewed Sloas after her call to the Attorney General's Office, in an attempt to rebut Sloas' testimony. Apparently, the Commonwealth was under the impression that Sloas did not mention Mayle's presence when she was initially interviewed by Detective Cales. However, Detective Cales testified that he could not remember whether Sloas mentioned Mayle or not.

The trial court enjoys broad discretion in its determination of the admissibility of rebuttal evidence. *See* RCr 9.24; *Chestnut v. Commonwealth*, 250 S.W.3d 288 (Ky.2008). Here, the trial court acted well within its discretion in permitting the Commonwealth to rebut Sloas' claim that Burton had confessed. In any event, considering Detective Cales' inability to remember his conversation with Sloas, it is difficult to conceive any prejudice to Appellant. There was no error.

### Bush Testimony

Jhonda Bush lived in the apartment next door to Appellant's mother and was home the night that Horton was murdered. As stated previously, Appellant and Minnie Burton were at his mother's apartment several hours before the murder and had gotten into a loud argument. Because Bush was unavailable at Appellant's first trial, she provided a written statement that was read into the record. In it, she stated that she overheard yelling and shouting in the next apartment at about 1:25 on the morning of August 19th. She heard the sound of glass shattering and then the commotion stopped. She did not actually see anyone entering or exiting the apartment next door.

During a pretrial hearing at Appellant's second trial, defense counsel moved to introduce Bush's statement from the first trial. The Commonwealth agreed to stipulate to the statement's introduction. Though the trial court requested that defense counsel prepare an order regarding the joint stipulation, none can be found in the record currently before this Court. Nonetheless, the statement was read to the jury absent an objection from either party.

■ Appellant now claims that the introduction of this statement violated his confrontation rights. In support, he asserts that the statement was inadmissible because the Commonwealth made no effort to locate Bush and because Appellant had no opportunity to cross-examine Bush. This argument is without merit, as Appellant waived this constitutional right.

■ "[A] criminal defendant may waive the constitutional right to confrontation." *Parson v. Commonwealth,* 144 S.W.3d 775, 783 (Ky.2004). "[N]o doubt the privilege (of personally confronting witnesses) may be lost by consent or at times even by misconduct." *Illinois v. Allen,* 397 U.S. 337, 342–43, 90 S.Ct. 1057, 1060, 25 L.Ed.2d 353 (1970), *quoting Snyder v. Massachusetts,* 291 U.S. 97, 106, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934).[5] Furthermore, contrary to Appellant's assertions, the trial court was not obliged to obtain a personal waiver of his rights: "Federal courts have uniformly held that counsel can waive a criminal defendant's Sixth Amendment right of Confrontation so long as the defendant does not dissent from his attorney's decision, and so long as

it can be said that the attorney's decision was a legitimate trial tactic or part of a prudent trial strategy." *Parson,* 144 S.W.3d at 783 (citations omitted). *See also Palfy v. Cardwell,* 448 F.2d 328, 332 (6th Cir.1971) (stipulations containing information which established defendant's guilt were properly admitted because defendant "knowingly and intelligently waived his right of confrontation").

It is evident that Appellant waived his right to confront Bush. It must be emphasized that defense counsel moved the court to introduce Bush's statement during a hearing at which defendant was present. *See Parson,* 144 S.W.3d at 784 ("Appellant was present and did not dissent from the waiver."). Of course, Appellant was also present at trial when the statement was read into the record, again without objection or comment. Furthermore, admission of Bush's statement was clearly a legitimate trial tactic. Bush's brief statement pertained only to the time when she heard a fight in Appellant's mother's apartment; she did not identify the voices she heard or see anyone leaving the apartment. Both the Commonwealth and the defense relied on this statement for the limited purpose of establishing a timeline for the evening. It is reasonable to assume that defense counsel preferred the simple solution of introducing Bush's statement, rather than attempting to locate and subpoena Bush.[6] We conclude that Appellant knowingly waived his right to confront this witness. There was no error.

### Prior Bad Acts Evidence

■ Appellant claims that the trial court improperly admitted evidence of pri-

5. *Snyder* was overruled in part on other grounds by *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

6. Defense counsel's statements at the hearing support this conclusion: "[T]here was a stipulation from what I would consider a pretty unavailable witness.... I have no idea where she is now. Unless the Prosecution has an objection to that, I would like to renew that that be put in or else I'd have to start my search for this woman."

or bad acts in violation of KRE 404(b). He directs our attention to nine different pieces of testimony, which we address individually below. No contemporaneous objections were made. *See* RCr 9.22. Thus, if an error occurred in the admission of this testimony, we determine whether the failure to object was a legitimate trial tactic. If not, we consider whether the testimony prejudiced Appellant. *Johnson*, 103 S.W.3d at 691. Reversal is required only if we believe that, absent the admission of the testimony, Appellant would not have been convicted or would not have been sentenced to death. *Id.*

*Drug Use*

▮ Christopher Trent testified that he spent the afternoon of August 18th with Appellant and that they drank beer and smoked marijuana that day. Minnie Burton testified that Appellant was "pretty high" and "taking pills" when they returned to Appellant's mother's apartment on the evening of August 18th. He now complains this testimony should have been excluded.

Appellant presented a defense of intoxication. To that end, defense counsel elicited testimony from several witnesses that Appellant was intoxicated. In fact, during opening arguments, defense counsel stated that Appellant was "highly intoxicated" and had been "drinking and drugging" all day. For this reason, we see no way in which Appellant was prejudiced by testimony regarding his marijuana use. *See Olden*, 203 S.W.3d at 675.

*Traffic Stop*

▮ Officer McDavid performed a traffic stop on a vehicle in which Appellant was a passenger on the evening of August 18th. McDavid testified that Appellant "made a derogatory statement toward us." However, prior to McDavid's testimony, defense counsel had asked another witness, Christopher Trent, if Appellant "got smart-alecky with the police." As defense counsel had already elicited identical information from another witness, any supposed error in the admission of McDavid's statement is harmless. *See Chumbler v. Commonwealth*, 905 S.W.2d 488, 494 (Ky. 1995).

*James Berry's Incarceration*

▮ When asked what she did on August 18th, Minnie Burton testified that she and Appellant drove to Ashland to visit Phyllis Berry's brother, James, who had "just gotten out of the pen." The fact that James Berry was incarcerated does not constitute evidence of Appellant's character simply because they were acquainted. Moreover, as this statement was not responsive to any question posed by the Commonwealth, it was not offered to establish Appellant's character in order to prove action in conformity therewith. This evidence does not fall within the ambit of KRE 404(b); accordingly, there was no error. *See Fields*, 12 S.W.3d at 284 (finding no error in admission of identical testimony at Appellant's first trial).

*Fight at Appellant's Mother's Apartment*

▮ In describing what occurred in the hours prior to the murder, Burton testified that she and Appellant argued while they were at his mother's apartment and that Appellant threw a knife into the living room during this altercation. John Fields, Appellant's brother, also testified about what transpired in the apartment. He stated that Appellant had rubbed a large butcher knife up and down his arm.[7]

---

7. *Appellant's brief states that defense counsel objected to this portion of John Fields' testi-* mony. *Our review of the record reveals that*

There was also testimony from both Burton and Pritchard that Appellant later attempted to break into Burton's apartment.

All of this testimony directly relates to what transpired immediately before Horton's murder. It helped to establish why Burton left Appellant's mother's apartment and why Appellant eventually went to Horton's property. *See Smith v. Commonwealth,* 366 S.W.2d 902, 906 (Ky.1962) ("[A]ll evidence which is pertinent to the issue and tends to prove the crime charged against the accused is admissible, although it may also prove or tend to prove the commission of other crimes by him[.]"). This testimony was also "inextricably intertwined" with the Commonwealth's proof of Appellant's mental state at the time of the offenses. KRE 404(b)(2). There was no error in the admission of testimony describing Appellant's actions in the hours before the crime.

### Jhonda Bush Stipulation

 In the stipulation read to the jury, Jhonda Bush stated that she overheard an argument in Appellant's mother's apartment and that it sounded as if "they were hitting each other." She further stated that it sounded like the voices of two men, but that she could not identify either voice. Bush's statement was entered to establish a timeline of events and to possibly corroborate Burton's testimony. It was not used to prove Appellant's character or action in conformity therewith and, thus, does not fall within the category of evidence prohibited by KRE 404(b). We note also that no prejudice flowed from this testimony, as Bush did not identify Appellant's voice as one of the voices she had overheard.

counsel was objecting to a different portion of the testimony.

### Burton's Fear of Appellant

 Burton testified that she left Appellant's mother's apartment because he was acting "wild" and she "was afraid of him." Kim Mayle, Burton's cousin, likewise testified that Burton wanted to get away from Appellant that evening. According to Mayle's testimony, Burton feared Appellant would physically assault her. Burton's aunt, Bernice Floyd, also testified that Burton expressed a fear of Appellant. None of this testimony constitutes evidence of "other crimes, wrongs, or acts" committed by Appellant. KRE 404(b). Rather, this testimony concerns Burton's mental state. There was no KRE 404(b) violation.

### Police Competency Evidence

As part of his defense theory, Appellant attempted to establish that the police did not thoroughly investigate the crime. He claims that numerous trial court rulings impaired his ability to fully develop this defense. Appellant directs our attention particularly to four rulings, which we address individually below.

### Testimony of Detective Stevens

 Kentucky State Police Detective Stevens was the lead investigator of Horton's murder. On cross-examination, defense counsel asked Detective Stevens if local law enforcement officers had made comments about how he was handling the investigation; he responded in the affirmative.[8] Defense counsel then attempted to inquire about an alleged confrontation between Stevens and a detective from the Grayson Police Department. The trial court sustained the Commonwealth's objection to this question.

8. Detective Stevens was called as a witness by both the Commonwealth and the defense.

406

■ "The presentation of evidence as well as the scope and duration of cross-examination rests in the sound discretion of the trial judge." *Moore v. Commonwealth*, 771 S.W.2d 34, 38 (Ky.1988). Here, we agree with the trial court that the testimony sought from Detective Stevens lacked relevancy. *See* KRE 402. Whether Stevens argued with local law enforcement officials about his handling of the investigation is not relevant to Appellant's guilt, nor does it tend to prove or disprove that the investigation was handled improperly. There was no abuse of discretion.

■ Appellant also complains that the Commonwealth was permitted to question Detective Stevens on cross-examination about the security of the crime scene. Specifically, the Commonwealth was permitted to ask Detective Stevens why crime scene tape was removed so quickly after Horton's murder. He explained that the police removed the crime scene tape to lessen public curiosity and interference with the investigation. Defense counsel's objection for relevancy was properly overruled. Defense counsel had elicited testimony that no crime scene tape was around Horton's home, implying shoddy police work. The Commonwealth was entirely within permissible bounds to question Detective Stevens about the decision to remove the crime scene tape.

*Admission of Unidentifiable Latent Fingerprints*

■ Appellant claims that the trial court improperly admitted latent fingerprint evidence collected from a storm window and a glass jar, both found at Horton's home. All six prints were analyzed but none were identified. Though defense counsel did not object to the introduction of these fingerprints, Appellant now argues that they were irrelevant because they were not identified. He also argues that their introduction improperly "bolstered" the Commonwealth's case. This claim is utterly without merit. The results of tests performed on fingerprints found at the crime scene are, of course, relevant to a determination of Appellant's guilt. Moreover, it also rebutted any claims of shoddy police work. Even if improperly admitted, we are unable to fathom how Appellant was prejudiced by fingerprints that were never identified as his.

*Cross–Examination of Murrie O'Brien*

■ Murrie O'Brien, an employee of Horton who performed maintenance work on her properties, testified that he went to Horton's home on the morning of August 19th. On cross-examination, O'Brien stated that he entered the victim's home through the back door. Over the Commonwealth's objection, defense counsel also inquired whether O'Brien encountered any police at the scene. He stated that several officers and other people were present, but that no crime scene tape was around the house.

Later, a juror submitted a question for O'Brien. Though the record does not reflect the exact wording of the proposed question, it appears that the juror wanted to ask O'Brien why the police did not stop him from entering Horton's home. The trial court rejected this question as speculative and outside O'Brien's knowledge, a conclusion with which we agree. Contrary to Appellant's assertion, there was no abuse of discretion.

*Limited Examination of John Rayburn*

■ Appellant claims that the trial court improperly limited his examination of John Rayburn, who purchased Horton's home from her estate. Rayburn testified that when he purchased the home, two storm windows were missing. He attempted to retrieve the missing storm win-

dows from the Grayson Police Department but was told that they were evidence and, therefore, unavailable. Some time later, Rayburn testified that Detective Stevens stopped by the house and asked him to be a witness in Appellant's first trial. According to Rayburn, Stevens asked him to testify that the original storm windows were returned to him and installed in the home. Rayburn refused, telling Stevens, "I can't testify to that because that's not the truth." After this exchange, Rayburn was not called as a witness at Appellant's first trial. He later contacted the Lexington Herald–Leader, but his call was not returned.

Defense counsel called Rayburn as a witness at Appellant's second trial and asked him why he had called the Lexington Herald–Leader. The trial court sustained the Commonwealth's objection to the question on the basis of relevancy. We agree with the trial court that Rayburn's reason for calling the newspaper was irrelevant. Defense counsel was given great leeway in its examination of Rayburn and was able to fully develop Rayburn's allegations of police misconduct. This minor limitation did not prejudice Appellant or unduly impair his ability to develop his defense. There was no abuse of discretion.

### Opinion Testimony

#### Murrie O'Brien

 Appellant argues that defense counsel was unduly limited in its examination of Murrie O'Brien, Horton's longtime carpenter and handyman. Defense counsel questioned O'Brien about the storm windows at Horton's home, although O'Brien had never worked on those specific windows. In an effort to demonstrate

that Appellant did not have sufficient time to remove all the screws from Horton's storm windows, defense counsel asked O'Brien how long it "generally takes you to remove screws from a large storm window if you're trying to remove them out?" The trial court sustained the Commonwealth's objection. Defense counsel was also prohibited from asking O'Brien if there were any score marks on the screws found on Horton's front porch. Finally, defense counsel showed O'Brien the broken knife found on Appellant at the time of his arrest and asked whether he had ever tried to remove screws with such a knife. An objection to this question was also sustained.

Rulings concerning the admissibility of evidence lie within the sound discretion of the trial court and are only overturned upon a showing of an abuse of that discretion. *Simpson v. Commonwealth*, 889 S.W.2d 781, 783 (Ky.1994). In each instance enumerated above, the trial court did not believe that O'Brien's testimony would assist the jury. Whether a screw has score marks, and how long it takes to remove a window screw, are topics well within the average juror's common knowledge and understanding. Furthermore, the jury was shown the screws and the window itself and, thus, had the opportunity to make such an assessment. Finally, O'Brien stated that he had never worked on that particular storm window and had never handled Appellant's knife. Accordingly, defense counsel's questions pertaining to the window and the knife were irrelevant. We see no abuse of discretion in the trial court's rulings with respect to this witness.[9]

#### Detective Stevens

 Appellant also challenges the admissibility of testimony from Detective

---

9. A juror submitted a question asking O'Brien how long it "usually takes to install a large storm window?" The trial court rejected this question. To the extent that Appellant claims this ruling was erroneous, we find no abuse of discretion.

Stevens about blood evidence. Defense counsel called Detective Stevens to testify about Horton's bedclothes and to explain why they had not been submitted for scientific testing. Stevens explained that a cut-out portion of the sheet was tested. On cross-examination, the Commonwealth asked Stevens whether the perpetrator's blood could have been detected on the sheets in light of the high volume of Horton's blood.

Defense counsel objected, claiming that Stevens was not qualified to give opinion testimony concerning scientific blood testing. The trial court overruled the objection and allowed Stevens to answer. He explained that, given his experience in crime scene investigation, testing would not be fruitful because so much of Horton's blood was present on the sheets.

Detective Stevens, a twenty-two year veteran of the Kentucky State Police who had also worked four years in the crime lab, was qualified to answer this question. He did not testify to the scientific process of blood examination. *Cf. Mondie v. Commonwealth*, 158 S.W.3d 203, 213 (Ky.2005). Rather, his response was limited to an explanation for his own actions at the crime scene and his motivations for such actions. As an experienced detective, Stevens was certainly qualified to testify about what type of evidence is collected at a crime scene and why. *See Bush v. Commonwealth*, 839 S.W.2d 550, 555 (Ky.1992). There was no error.

*Dr. Hunsaker*

■ Appellant next complains that Dr. Hunsaker, a forensic pathologist who testified as an expert for the Commonwealth, was improperly permitted to answer questions outside his realm of expertise. The trial court relayed the following question submitted by a juror: "Can the manner in which a person is murdered reflect the mood of the person committing the

crime?" After a bit of confusion about the wording of the question, Dr. Hunsaker replied with a simple "yes." There was no contemporaneous objection.

Appellant relies on our holding in *Johnson*, where Dr. Hunsaker was asked questions about psychological profiling and the phenomenon of "overkill." 103 S.W.3d at 695. We agreed with the trial court's finding regarding Dr. Hunsaker's qualifications: "Dr. Hunsaker, by his own acknowledgement, was not properly qualified to testify on 'overkill.' He is a forensic pathologist without special qualifications in psychological profiling." *Id.*

Here, however, Dr. Hunsaker was not asked to give specialized testimony involving expertise in psychology. Dr. Hunsaker was asked whether the method of killing can reflect the killer's mood, which he answered in the affirmative without explanation. He was not asked to analyze the manner of Horton's murder, in particular, or to give an opinion about the mood of Horton's killer. The simple *fact* that such psychological profiling does exist is well within Dr. Hunsaker's area of expertise. There was no abuse of discretion.

*Qualification of Experts*

■ Appellant complains that the trial court improperly qualified four expert witnesses in front of the jury. Of course, trial courts must be cautious in deeming a witness an expert. "If the jury is so informed such a conclusion obviously enhances the credibility of that witness in the eyes of the jury. All such rulings should be made outside the hearing of the jury and there should be no declaration that the witness is an expert." *Luttrell v. Commonwealth*, 952 S.W.2d 216, 218 (Ky.1997). Our review of the record reveals that three of these witnesses were not referred to as "experts" by the trial court or the Com-

monwealth.[10] In the case of Dr. Hunsaker, the Commonwealth did ask the trial court to allow him to "give his opinions and his expert testimony." Nonetheless, we find this minor, unpreserved error to be harmless. Dr. Hunsaker's testimony was necessary mainly to establish time of death. However, the time frame of death he provided fit as equally into the defense theory that Burton committed the murder as it did the Commonwealth's theory. Indeed, the defense favorably referenced not only his testimony in closing arguments, but also his qualifications and reliability. For this reason, we discern no prejudice to Appellant's substantial rights. RCr 9.24.

### Floyd Testimony

█ Barbara Floyd, the daughter of Bernice and Kenny Floyd, testified for the Commonwealth about Burton's late night visit to the Floyds' home. Floyd stated that she looked at the clock when Burton arrived and that it was 1:45 a.m. Because there was some discrepancy about the timeline of the evening, the Commonwealth posed several questions about the accuracy of Floyd's clock. Appellant's bald claim that this testimony was introduced without a proper foundation is entirely without merit. We are aware of no foundational requirements for asking a witness whether her bedroom clock is accurate. There was no abuse of discretion.

### Hearsay Testimony

█ After Burton left her aunt's house on the night of the crimes, she encountered her cousin, Kim Mayle. Mayle gave Burton a ride back to Appellant's mother's apartment to check on John Fields. Mayle testified that Burton was really nervous and that they quickly left because Burton feared Appellant would physically assault her.

Bernice Floyd also testified about Burton's nervousness that evening. Burton told her aunt that Appellant had said he had killed his brother and that he was acting crazy. Floyd eventually called the police to relay this information.

Appellant now argues this testimony was inadmissible hearsay. However, prior to both Mayle's and Floyd's testimony, Burton related her nervousness and her fear of Appellant to the jury during her own testimony. Indeed, defense counsel cross-examined Mayle about Burton's fear that night. As the jury had already heard an explanation for Burton's nervousness that evening, any error was undoubtedly harmless. See Chumbler, 905 S.W.2d at 494. See also Fields, 12 S.W.3d at 284 ("The fact that Minnie Burton was afraid of the Appellant logically followed the facts that Appellant had thrown knives at her while at his mother's residence and had told her that he had just killed his brother.").

### Victim Impact Testimony

Appellant claims that the trial court permitted the Commonwealth to inject victim impact testimony throughout the guilt phase proceedings. He points to the testimony of several witnesses, as well as questions posed by the Commonwealth during voir dire. We address each below.

█ During general voir dire, the Commonwealth gave some general background information about Horton, including her residence, her community involvement, her husband's career, and the fact that her nephews are attorneys in Grayson. These questions were aimed at determining whether any veniremen had a

---

10. Instead, the Commonwealth asked the trial court that the witness be allowed to give his or her opinion or findings; e.g., "Your honor, I ask that this witness be allowed to give her observations about any analysis she's done in this case."

relationship with Horton or her family that would create bias. The questions did not reference Horton's "wealth or status in the community," as Appellant contends.

■ Martha Harber's testimony did not constitute victim impact testimony. Harber, Horton's niece, gave brief testimony about Horton's personal background, her career, her marriage, and her community involvement. When she referenced her long and loving relationship with her aunt, it was to establish her basis of knowledge of Horton's habits and finances. Nowhere in Harber's brief testimony did she describe the personal impact of Horton's death. Her testimony humanized Horton; it did not in any way glorify her. *See Cook v. Commonwealth*, 129 S.W.3d 351 (Ky. 2004).

■■ There was no error in allowing the Commonwealth to display a photograph of Horton during opening arguments. "A murder victim can be identified as more than a naked statistic[.]" *Bowling v. Commonwealth*, 942 S.W.2d 293, 302 (Ky.1997). The display of one photograph of Horton was not unduly prejudicial. *See Hilbert v. Commonwealth*, 162 S.W.3d 921, 927 (Ky.2005) ("The brief display of the victims' life portraits ... was neither excessive nor overly emotional.").

■ Barbara Marshall, an employee of Grayson Utility Company, was called by the defense to testify about Horton cutting off the utilities in Burton's duplex. On cross-examination, the Commonwealth elicited that Horton owned several properties in Grayson. This question helped to explain why Marshall knew Horton personally, through her frequent business with the utility company. Later, the Commonwealth asked if "it is fair to say that Ms. Horton was an important part of Grayson?" Defense counsel objected; the trial court allowed the question. We agree

with Appellant that this question lacked relevancy. However, we believe the error was harmless. There is no indication that the Commonwealth's brief reference to Horton's standing in the community unduly prejudiced Appellant or denied him a fair trial.

■ When the Commonwealth asked James Craig if Horton was a "well-liked person" who "had people coming over," it was to establish that she welcomed both smokers and non-smokers into her home. The Commonwealth, in inquiring whether Horton kept belongings in a safe-deposit box, referred to the bank across the street as "her" bank. Horton, in fact, did have partial ownership in the bank. There was nothing improper about the Commonwealth's questions.

■ During its cross-examination of Detective Stevens, the Commonwealth questioned him about publicity surrounding the case: "You realize you got quite a case on your hands, correct? Given the person and the way it was done, right?" These questions were asked to rebut defense counsel's inference that Detective Stevens did not adequately secure the crime scene and to explain why he was concerned about public curiosity. There was no error.

Even considering these references to Horton cumulatively, we find no indication of the type or amount of prejudicial victim information that would require reversal. None of the above-referenced witnesses were "overly emotional, condemnatory, accusative or demanding vindication[.]" *Foley v. Commonwealth*, 953 S.W.2d 924, 937 (Ky.1997). The Commonwealth's references to Horton were not of an inflammatory nature and did not approach the type of prejudicial testimony condemned by this Court in *Ice v. Commonwealth*, 667 S.W.2d 671, 675–76 (Ky.1984).

### Marshall Testimony

During its cross-examination of Barbara Marshall, the Commonwealth elicited that she was acquainted with Appellant; although she was unaware he dated Burton. The Commonwealth then asked whether she knew "what kind of problems the Defendant may have caused for Minnie Burton, if any, with Ms. Horton before she was killed?" Marshall answered in the negative. This question was clearly in response to defense counsel's direct examination of the witness, during which Marshall was asked why Horton wanted the utilities cancelled. Furthermore, as Marshall simply replied "no," we can detect no prejudice to Appellant. The trial court did not abuse its discretion.

### McDavid Testimony

There was no error in the Commonwealth's reference to Appellant's confession during its re-direct examination of Officer McDavid, to whom Appellant had made a derogatory comment during the traffic stop. The Commonwealth attempted to elicit from McDavid, who had known Appellant for many years, whether he could tell the difference between a "smart-aleck" comment and a confession, as it was the defense's position that Appellant's confession was simply a sarcastic comment. Appellant's confession was properly admitted and there was no error in the Commonwealth's subsequent reference to it.

### Images of Crime Scene

The photographic evidence of Horton's body was neither cumulative nor unduly prejudicial. Photographs of Horton's body and a video of the crime scene were shown to the jury, in most instances during the testimony of an investigating officer to describe the nature of the crime and the crime scene. Dr. Hunsaker referred to photographs of Horton's body to explain the autopsy procedures and his findings, although no post-autopsy photographs were displayed. The Commonwealth used photographs of the crime scene, which included Horton's body, during its opening and closing arguments.

The trial court conducted the requisite balancing test between the probative value of these images and their prejudicial effect. See KRE 403. The images depicted a violent crime scene and, naturally, were gruesome and disturbing. However, Horton's wounds were critical to a full understanding of the case, particularly in light of defense counsel's arguments that Burton had enough strength to lodge the knife into Horton's skull and that Appellant did not have sufficient time to inflict so many wounds. Furthermore, the Commonwealth was entitled to present its case fully, even if doing so involved gruesome images, regardless of any defense stipulation as to the manner of Horton's death. "[T]he prosecution is entitled to prove its case by competent evidence of its own choosing, and the defendant may not stipulate away the parts of the case that he does not want the jury to see." *Barnett v. Commonwealth,* 979 S.W.2d 98, 103 (Ky. 1998). The photographs were not admitted to arouse passion or appall the viewer, as condemned in *Funk v. Commonwealth,* 842 S.W.2d 476, 478–480 (Ky.1992). There was no abuse of discretion in the trial court's conclusion that the probative value of these images outweighed their prejudicial effect. See *Roark v. Commonwealth,* 90 S.W.3d 24, 37 (Ky.2002).

## Other Guilt Phase Issues

### Jury View of Carter County

The trial court did not err in refusing a jury view of certain areas of Carter County, including Horton's home and Burton's duplex apartment. The aerial

maps, photographs, and testimony adequately related the area of the crime and the distances between various locations in Grayson. From this evidence, the jury was able to draw conclusions about the timeline of the evening of Horton's murder. The trial court did not abuse its discretion with respect to defense counsel's motion for a jury view. *See Dawes v. Commonwealth*, 349 S.W.2d 191, 193 (Ky. 1960).

### Venue

Appellant was originally indicted in Carter County. Defense counsel moved the Carter Circuit Court to transfer venue pursuant to KRS 452.210, after an unsuccessful attempt to seat a jury. Venue was transferred to the Morgan Circuit Court but, again, a jury was unable to be selected. The parties agreed to transfer venue to the Rowan Circuit Court.

■ Upon reversal of Appellant's original conviction, this matter was remanded to the Rowan Circuit Court.[11] Defense counsel filed a motion requesting the case be remanded to the Carter Circuit Court, the county of indictment, which was denied. There was no error in this decision. The motion was made pursuant to KRS 452.290, which requires that a case be transferred back to the county of indictment when the trial court is satisfied that a "state of lawlessness" no longer exists. However, by its own language, KRS 452.290 applies only to cases in which venue was originally changed due to a state of lawlessness pursuant to KRS 452.230. In this case, venue was originally transferred from the Carter Circuit Court pursuant to KRS 452.210. Thus, KRS 452.240 prohibits an additional change of venue. The Rowan Circuit Court retained jurisdiction

of the matter upon remand and, therefore, the motion was properly denied.

### Second Competency Evaluation

■ Prior to Appellant's first trial, a competency evaluation was conducted and a report issued. However, despite defense counsel's successful motion for a comprehensive neurological evaluation, there is no evidence in the record that further testing was conducted or that a competency hearing was held. The Commonwealth informed the trial court of this circumstance prior to Appellant's second trial. In light of this Court's decision in *Thompson v. Commonwealth*, 56 S.W.3d 406, 408 (Ky. 2001), holding that a KRS 504.100(3) competency hearing cannot be waived, the trial court ordered a hearing. We find no error in this decision, as defense counsel's motion at the prior proceedings created "reasonable grounds" for the trial court to question Appellant's competency. KRS 504.100(1). Further, we conceive no prejudice to Appellant resulting from the competency hearing. No prejudicial information was obtained by the Commonwealth during its questioning of Appellant at the competency hearing. There was no error.

### Right to be Present

■ Appellant complains that two pretrial hearings were conducted in his absence, in violation of his Sixth Amendment rights. The first hearing was for the purpose of providing personnel records of police witnesses to counsel and to allow defense counsel to object to certain pieces of KRE 404(b) evidence. The second hearing concerned the competency of witness, Vince Kimmel, and minor administrative matters. At both, defense counsel object-

---

11. It was by subsequent agreed order that venue was again transferred to the Floyd Circuit Court.

ed to the trial court's decision to conduct the hearings in Appellant's absence. Nonetheless, the trial court proceeded in light of the expense and logistical complications of bringing Appellant to the courthouse.[12]

RCr 8.28(1) requires that the defendant "be present at the arraignment, at every critical stage of the trial including the empanelling of the jury and the return of the verdict, and at the imposition of the sentence." However, "[a] defendant is not required to be present during the argument of legal issues between court and counsel." *Caudill v. Commonwealth,* 120 S.W.3d 635, 652 (Ky.2003). The first hearing mainly concerned the admissibility of Appellant's statements to Officer McDavid. There was no factual dispute about these statements, as both parties were analyzing Appellant's testimony at his first trial. The arguments to the trial court were purely legal and concerned the applicability of KRE 404(b) to the statements. The second consisted only of legal arguments concerning the unavailability of Vince Kimmel.[13] At both, Appellant's presence would have been of little help to defense counsel. *See Lester v. Commonwealth,* 132 S.W.3d 857, 862 (Ky.2004). As neither of these hearings constituted a "critical stage" in the proceedings, Appellant's substantial rights were not implicated. We find no abuse of discretion in the trial court's decision to proceed with the hearings in Appellant's absence.

*Guilt Phase Closing Arguments*

Appellant asserts that the Commonwealth's guilt phase closing argument was so prejudicial and inflammatory that he was denied due process of law. He directs our attention to several instances of improper arguments, which we address individually. Having reviewed the argument in its entirety, we do not agree with Appellant's assessment and find nothing improper about the Commonwealth's closing statement.

In examining Burton's actions on the evening of Horton's death, the Commonwealth rhetorically asked the jury if it had heard "any other explanation" for Burton's nervousness. When read in context, this statement cannot fairly be considered a comment on Appellant's exercise of his Fifth Amendment right to remain silent. Instead, the Commonwealth is commenting on the lack of a reasonable explanation for Burton's nervousness. This statement is qualitatively different than the type of commentary on a defendant's silence, which was condemned in *Beavers v. Commonwealth,* 612 S.W.2d 131 (Ky.1980).

The Commonwealth did not refer to matters outside the record or misstate the evidence when it discussed the knife found in Horton's bedroom. Minnie Burton could not definitively identify the knife as one from her house, but she did testify that it had an insignia near the handle similar to knives of her own. The Commonwealth urged the jury to conclude that the knife belonged to Burton based upon her inconclusive testimony, her willingness to recognize the possibility that the knife belonged to her, and the cheap quality of the knife as compared to Horton's own

12. The trial court noted on the record that Appellant was housed in the Rowan County jail, not in Floyd County, and that he was a security risk due to a prior conviction for escape.

13. Both parties agreed that Kimmel was incompetent to testify. The Commonwealth opposed only defense counsel's motion for a continuance. The trial court held the matter for further consideration at a date closer to the start of trial.

knives. The Commonwealth's closing argument in this regard was limited to fair inferences that may be drawn from the physical evidence and Burton's testimony. *See Brown v. Commonwealth,* 174 S.W.3d 421, 431 (Ky.2005).

The Commonwealth's Attorney did express his personal opinion about the presence of score marks on the screws taken from Horton's storm window. The prosecutor stated, "In my opinion.... I do see marks." However, the prosecutor immediately followed this comment with, "But you go with your opinion and that is what counts." We see nothing improper in this comment.

The Commonwealth did not misstate the law with respect to intoxication and second-degree manslaughter. The Commonwealth's argument simply urged the jury to reject second-degree manslaughter in favor of intentional murder and to also reject a finding of voluntary intoxication. For the reasons stated *infra,* the jury instructions were proper and the Commonwealth's closing argument was tailored to these instructions. There was no error.[14]

## Guilt Phase Instructions

### Wording of Intoxication Instruction

■ Appellant argues that he was denied due process of law by the wording of the guilt phase instructions. With respect to the homicide, the trial court instructed the jury on murder, wanton murder, and second-degree manslaughter. It also delivered a separate intoxication instruction, which read:

Even though the Defendant might otherwise be guilty of Intentional Murder and/or First Degree Burglary, you shall

not find him guilty under those Instructions if at the time he committed the offenses, if he did so, he was so intoxicated that he did not form the intention to commit the offenses.

An identical intoxication instruction was approved by this Court in *Mabe,* 884 S.W.2d at 672. *See also Brown v. Commonwealth,* 575 S.W.2d 451, 452 (Ky.1978). Appellant, however, argues that the trial court should have included the following additional language: "If you believe from all the evidence beyond a reasonable doubt that he did act wantonly as defined under Instruction No. ___ then you shall find him guilty of Second–Degree Manslaughter under Instruction No. ___." According to Appellant, the intoxication instruction as delivered gave the jury the erroneous impression that, if it believed he was voluntarily intoxicated at the time of the crimes, he would be fully acquitted.

■ Appellant recognizes the well-settled principle that voluntary intoxication is not an absolute defense, but rather reduces an intentional crime to one requiring a culpable mental state of wantonness. *Slaven v. Commonwealth,* 962 S.W.2d 845, 856–57 (Ky.1997). In determining how to convey this premise to the jury, this Court has explained that a "separate instruction on intoxication explains to the jury how that defense affects the element of intent. It is unnecessary to repeat that explanation in the instruction on the primary offense." *Slaven,* 962 S.W.2d at 857 (internal citations omitted). Here, Appellant is requesting the inverse of the instruction requested in *Slaven.* Instead of the effect of the voluntary intoxication instruction being incorporated into the instruction on the primary offense, Appellant would like

---

**14.** Appellant's brief complaint that the Commonwealth misstated the evidence as to Appellant's level of intoxication raises no concern. The error, if any, was undoubtedly harmless as defense counsel made Appellant's level of intoxication abundantly clear during its own closing argument.

that effect explained within the voluntary intoxication instruction itself. As in *Slaven*, when read in their entirety, the instructions delivered in this case accurately state the law and the effect that voluntary intoxication has on a finding of intentional murder. *See Bills v. Commonwealth*, 851 S.W.2d 466, 471 (Ky.1993) ("[J]ury instructions must be read as a whole."). There was no error.

### Wording of Intentional Murder Instruction

■ Appellant makes several other claims of error with respect to the wording of the jury instructions, none of which require reversal. The language of the intentional murder instruction was not prejudicial because it required a finding that Appellant killed "Bess Horton by cutting her throat with a knife." An identical instruction was approved by this Court in Appellant's first trial. *See Fields*, 12 S.W.3d at 285 ("Except for the failure to include an instruction on second-degree manslaughter, the trial judge's instructions accurately framed the law of the case."). In *Commonwealth v. Hager*, we provided a specimen instruction that included language that the defendant killed the victim "by stabbing him with a knife." 41 S.W.3d 828, 846 (Ky.2001). There was no error.

### Wanton Murder

■ Appellant argues that the trial court erred by instructing the jury on wanton murder, which he claims was unsupported by the evidence. Without specifically determining whether the evidence warranted an instruction on wanton murder, we can conclude that any supposed error was harmless. In *Smith v. Commonwealth*, we explained that no prejudice flows to a defendant where the jury is erroneously given an instruction on a lesser-included offense. "He cannot establish prejudice by showing that he was subjected to a greater penalty because the penalty options for intentional murder and wanton murder are the same[.]" 737 S.W.2d 683, 689 (Ky.1987).

The jury in this case found Appellant guilty of murder beyond a reasonable doubt. Appellant was not prejudiced by the fact that the jury had the opportunity to find him guilty of wanton murder, but declined to make such a finding. There is no reasonable possibility that Appellant would not have been convicted or would not have received the death penalty had the wanton murder instruction not been given. The error, if any, was harmless.

### First–Degree Manslaughter

■ Appellant was not entitled to an instruction on first-degree manslaughter pursuant to KRS 507.030(1)(b), because no evidence was presented of an extreme emotional disturbance (EED). *See Caudill*, 120 S.W.3d at 667. An EED is "an enraged, inflamed, or disturbed" mental state which causes one to act uncontrollably and for which there is a reasonable explanation or excuse. *McClellan v. Commonwealth*, 715 S.W.2d 464, 468–69 (Ky. 1986). There is also a requirement of provocation, often referred to as the triggering event. *Fields v. Commonwealth*, 44 S.W.3d 355, 359 (Ky.2001).

Here, there was no evidence of either an EED or a triggering event. While the evidence indicated that Appellant was intoxicated, substance abuse alone does not authorize a first-degree manslaughter instruction under an EED theory. *See Bowling*, 873 S.W.2d at 179. Furthermore, Appellant's fight with Burton at his mother's apartment does not constitute a triggering event. The uncontroverted testimony was that Burton left the apartment and that Appellant stayed behind for a half hour with his brother smoking cigarettes, demonstrating an interruption of the sup-

posed triggering event. *Cf. Springer v. Commonwealth*, 998 S.W.2d 439, 452 (Ky. 1999). Finally, no explanation was provided as to why the fight with Burton so enraged Appellant; a simple fight with a girlfriend does not provide a reasonable excuse or explanation for an enraged or inflamed state of mind. *See Caudill*, 120 S.W.3d at 668 (resistance to a demand for money does not amount to a reasonable explanation for an extreme emotional disturbance). The trial court did not err in refusing this instruction.

### Second–Degree Burglary and Criminal Trespass

■■■ Appellant was not entitled to a second-degree burglary instruction. The uncontroverted testimony at trial was that Appellant had a knife and razor blades on his person when he was arrested in Horton's bedroom and, therefore, the trial court instructed the jury only on first-degree burglary. The fact that the jury might not have believed this testimony does not warrant instruction on second-degree burglary; rather, it would have authorized an acquittal on the first-degree burglary charge. The trial court has no duty to instruct on theories of the case that are not supported by the evidence. *Payne v. Commonwealth*, 656 S.W.2d 719, 721 (Ky.1983).

■■■ For the same reason, Appellant was not entitled to a first-degree criminal trespass instruction. There was no evidence that Appellant entered Horton's home for a lawful purpose without the intent to commit a crime. *See Commonwealth v. Sanders*, 685 S.W.2d 557, 559 (Ky.1985). From the time of entry (after midnight) and the method of entry (through removal of a storm window), the jury could infer Appellant entered the home unlawfully. There was no error.

### Missing Evidence Instruction

■■■ There was no need for a missing evidence instruction concerning the storm window removed from Horton's home and later lost by the Grayson Police Department. Due process is implicated only when the failure to preserve or collect evidence was intentional and the potentially exculpatory nature of the evidence was apparent at the time it was lost or destroyed. *Estep v. Commonwealth*, 64 S.W.3d 805, 810 (Ky.2002). Neither condition is satisfied here. That Detective Stevens might have asked Rayburn to say the original storm windows were returned does not prove that there was intentional destruction of evidence; even if believed, it proves only that Detective Stevens was aware the window was lost. There was no other evidence of bad faith. Furthermore, it must be remembered that, while the storm window itself was not located, fingerprint testing had already been performed and no latent fingerprints were recovered. Thus, we fail to see how the exculpatory nature of the window was evident at the time it was lost or destroyed or how the evidence was adverse to the Commonwealth and favorable to the defense. There was no error in the trial court's refusal to deliver a missing evidence instruction. *See Collins v. Commonwealth*, 951 S.W.2d 569, 573 (Ky.1997) (negligence on the part of the Commonwealth in its preservation of evidence does not rise to the level of bad faith required for a missing evidence instruction).

### Penalty Phase Issues

### Non–Statutory Aggravating Circumstances

■■■ Appellant claims that the Commonwealth impermissibly urged the jury to consider Appellant's demeanor in the courtroom and his criminal history as nonstatutory aggravating circumstances.

We disagree with this assessment. The Commonwealth's reference to Appellant's demeanor in the courtroom was permissible and did not elevate "lack of remorse" to the level of an aggravating circumstance. *Johnson,* 103 S.W.3d at 697.

■ Furthermore, the jury found the existence of an aggravating circumstance contained in KRS 532.025(2)(a)(2): "The offense of murder … was committed while the offender was engaged in the commission of … burglary in the first degree …." "A statutory aggravating circumstance serves to place the appellant in the class eligible for the death penalty." *Bevins v. Commonwealth,* 712 S.W.2d 932, 935 (Ky.1986). As Appellant was already placed in the class eligible for the death penalty, any consideration of his lack of remorse was harmless.

*Penalty Phase Instructions*

Appellant submitted penalty phase instructions which were rejected by the trial court. He cites numerous errors in the instructions that were delivered to the jury. None support a finding of error.

■ "Jury instructions at the sentence stage of a capital trial need not include any particular words or phrases to define the concept of mitigation or the function of mitigating circumstances." *Tamme,* 973 S.W.2d at 37–38. The trial court's instructions adequately described the function and purpose of mitigating circumstances. The trial court acted within its discretion in rejecting Appellant's proposed mitigation instruction, which referred to circumstances or factors that "in fairness and mercy lesson or reduce his responsibility or moral culpability."

■ The trial court was not required to specifically instruct the jury that it could impose a term of imprisonment, even if it also found the presence of an aggravating circumstance. From the wording of the instructions and from counsel's closing argument, the jury was made aware of its option to reject the death penalty. *See Skaggs,* 694 S.W.2d at 679. There was no reversible error.

■ Appellant urged the trial court to instruct the jury that it need not find the existence of mitigating circumstances unanimously. "An instruction on non-unanimous findings on mitigation is not required." *Bowling,* 873 S.W.2d at 180. The instructions in this case did not misinform the jury about mitigating circumstances as in *Mills v. Maryland,* 486 U.S. 367, 373–75, 108 S.Ct. 1860, 1865–66, 100 L.Ed.2d 384 (1988). There was no error.

■ Appellant cites error where the trial court refused to give penalty phase instructions regarding his parole eligibility. "[P]arole eligibility information which is fully admissible under KRS 532.055 has no place in a death penalty hearing pursuant to KRS 532.025. Under no circumstances should parole eligibility enter into death penalty deliberations." *Perdue v. Commonwealth,* 916 S.W.2d 148, 164 (Ky.1995). There was no error.

■ There is no need to include a standard of proof such as "beyond a reasonable doubt" in a mitigating circumstance instruction. The jury is not required to make findings with respect to mitigation evidence. They are required only to consider such evidence. Thus, there is no need to define the standard of proof. *Tamme,* 973 S.W.2d at 38.

■ The trial court was under no duty to instruct the jury that it must not be influenced by prejudice or passion. "While such an instruction is permissible, an examination of these factors should be made by the trial court reviewing a death

sentence." *Perdue,* 916 S.W.2d at 169. No instruction was required in this case.

■ Appellant sought to instruct the jury that "no juror should surrender his or her honest conviction as to the weight or effect of the evidence solely because of the opinion of other jurors." The instructions satisfactorily informed the jury that its verdict must be unanimous. The trial court did not err in refusing this instruction.

■ Appellant contends that he was entitled to a stand-alone instruction regarding "residual doubt." The proposed instruction stated: "If any individual juror has any doubt as to the appropriate punishment, then you shall not sentence Sam Fields to death and shall instead fix his punishment at a sentence of imprisonment." The trial court's instructions with respect to reasonable doubt and the unanimity requirement adequately informed the jury of its duty. This proposed instruction was properly denied. *See St. Clair,* 140 S.W.3d at 571.

■ Appellant makes two final arguments that are without merit. Appellant's complaints with respect to the composition of the verdict form are baseless. The verdict form used simple, clear language that did not mislead the jury. Also, there is no requirement that the jury make written findings with respect to mitigation. *Smith v. Commonwealth,* 734 S.W.2d 437, 451 (Ky.1987).

### Commonwealth's Penalty Phase Closing Argument

Appellant complains at length that the Commonwealth's penalty phase closing argument was highly improper and denied him due process of law. We have reviewed the Commonwealth's argument in its entirety and have found nothing improper. Nonetheless, we briefly address Appellant's complaints.

The Commonwealth was entitled to refer to Appellant's entire criminal history, even though some of his prior convictions are outside of the statutory list of aggravating circumstances rendering him eligible for the death penalty. KRS 532.025(1)(b) expressly permits such reference.

■ The Commonwealth did not use Appellant's escape conviction as a nonstatutory aggravating circumstance amounting to a claim of future dangerousness. Appellant's claim to the contrary is not supported by the record. The Commonwealth's reference to Appellant's escape conviction was a fair commentary on his criminal background.

The Commonwealth did not minimize the jury's responsibility in sentencing Appellant. Nor did it inform the jury that its decision was only "a recommendation." *Cf. Ice,* 667 S.W.2d at 676.

■ It is not error for the Commonwealth to ask the jury to "fix a punishment that fits the crime." Likewise, the Commonwealth's reference to Appellant's demeanor in the courtroom was not improper, nor was it a comment on Appellant's exercise of his right to remain silent.

■ The Commonwealth's very brief statement that the jury "speak[s] for the community" was undoubtedly harmless. The comment was fleeting and did not appeal to the jurors' fears or prejudices.

The Commonwealth did not make a "Golden Rule" argument to the jury, nor did it attempt to use sensationalizing tactics. The closing argument cannot fairly be characterized as an emotional or inflammatory appeal to the jury on behalf of the family. *Cf. Clark v. Commonwealth,* 833 S.W.2d 793, 797 (Ky.1991).

■ Appellant claims that the Commonwealth continually misstated the law in its penalty phase closing argument. Upon review, the Commonwealth's statements simply urged the jury to draw certain inferences from the evidence. "[T]he Commonwealth's Attorney is allowed reasonable latitude in argument to persuade the jurors the matter should not be dealt with lightly." *Lynem v. Commonwealth,* 565 S.W.2d 141, 145 (Ky.1978). The Commonwealth did not exceed these bounds.

### Trial Judge's Report

Appellant argues that this Court should articulate clearer standards to be employed by the trial court in imposing the death penalty. Appellant directs our attention to the trial court's failure to make findings as to specific mitigating circumstances. This argument was considered and rejected by this Court in *Bowling:* "[T]he trial court was within its proper discretion in upholding the jury's sentence of death. The contention that there is no properly articulated standard of review for the trial court in such a circumstance is without merit." 942 S.W.2d at 306.

### Statistical Evidence About Parole

■ Appellant sought to introduce statistical evidence about parole success and parole criteria during the penalty phase. While the trial court permitted general evidence of parole eligibility guidelines, it rejected the introduction of parole eligibility statistics relied on by the Parole Board. The trial court properly rejected this evidence as it had little relevancy or direct relationship to Appellant's case. There was no error.

### Burglary Conviction as an Aggravating Circumstance

■ The use of Appellant's burglary conviction does not constitute double jeopardy. This argument was considered and rejected in *Bowling:* "The underlying offenses were only factors to be considered as to whether the punishment for murder should be death. Appellant was not subjected to double jeopardy or multiple punishment for the same offense." 942 S.W.2d at 308.

### Death Penalty Challenges

Appellant makes several claims of error concerning the death penalty, all of which have been continually rejected by this Court. We decline the invitation to revisit these decisions.

■ There is no error in the removal of jurors who cannot consider the entire range of penalties, including the death penalty. *See Hodge v. Commonwealth,* 17 S.W.3d 824, 838 (Ky.2000).

■ The constitutionality of the death penalty has been repeatedly recognized. *Thompson,* 147 S.W.3d at 55. Further, KRS 532.025 provides adequate standards to guide the jury in its consideration and imposition of the death penalty. *Hodge,* 17 S.W.3d at 854. Finally, the death penalty is not imposed arbitrarily or capriciously in Kentucky. *Tamme,* 973 S.W.2d at 40–41.

■ Kentucky's proportionality review is constitutional and comports with statutory requirements and the federal Constitution. *Sanders,* 801 S.W.2d at 683.

■ There is no right to access this Court's KRS 532.075 review data. *Ex parte Farley,* 570 S.W.2d 617, 624 (Ky. 1978).

Appellant provides no evidentiary basis for the claim that there was "residual doubt" as to his guilt. Suffice to say, the evidence was sufficient to support the conviction.

 Lethal injection is not cruel and unusual punishment *Baze v. Rees,* —— U.S. ——, 128 S.Ct. 1520, 1526, 170 L.Ed.2d 420 (2008).

### Proportionality Review

 Pursuant to KRS 532.075, we have reviewed the death sentence imposed herein. We have likewise reviewed the record, the arguments of counsel, and the evidence presented. We find no indication that the verdict or sentence was imposed under the influence of passion, prejudice, or other arbitrary factor. *See* KRS 532.075(3)(a). The evidence of the statutory aggravating circumstance of burglary was substantial and compelling. *See* KRS 532.075(3)(b).

Upon review of those cases in which the death penalty was imposed, we conclude that Appellant's sentence is neither excessive nor disproportionate. *See* KRS 532.075(3)(c). *See also Johnson,* 103 S.W.3d at 698; *Mills,* 996 S.W.2d at 495. We have given particular attention to those cases where a single murder occurred during the course of a burglary or robbery. *See Caudill v. Commonwealth,* 120 S.W.3d 635 (Ky.2003); *Meadows v. Commonwealth,* 550 S.W.2d 511 (Ky.1977); *Marlowe v. Commonwealth,* 709 S.W.2d 424 (Ky.1986). Bess Horton was murdered in a most brutal manner. Her throat was sliced from ear to ear and a knife was lodged so deeply into her right temple that it protruded from the left side. Moreover, she was ambushed in her own home as she slept. Even more significant is the complete lack of any articulable motive for the crime. *See Thompson,* 147 S.W.3d at 55. There was no error.

### Cumulative Error

Upon comprehensive review of the proceedings in this case, we are convinced that Appellant received a fundamentally fair trial and penalty proceeding. There was insufficient harmless error to create a cumulative effect that would mandate reversal of Appellant's conviction or sentence.

For the reasons set forth herein, the judgment of the Floyd Circuit Court is affirmed.

MINTON, C.J.; ABRAMSON, NOBLE, SCHRODER, and VENTERS, JJ., concur. SCOTT, J., not sitting.