RENDERED: AUGUST 26, 2021
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2019-SC-0648-MR

SHAWN SUTTON                                APPELLANT


ON APPEAL FROM MCCRACKEN CIRCUIT COURT
V.            HONORABLE TIMOTHY KALTENBACH, JUDGE
NO. 18-CR-00329


COMMONWEALTH OF KENTUCKY                 APPELLEE


**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>AFFIRMING</u>**


Shawn Kelly Sutton was convicted of first-degree assault, attempted murder, first-degree wanton endangerment, two counts of first-degree burglary, theft by unlawful taking of firearms, and theft by unlawful taking of property valued in excess of $500 but less than $10,000, as well as four misdemeanor offenses, as a result of events surrounding the home invasion of his ex-girlfriend Jennifer Davis's trailer on February 11, 2018.[1] Consistent with the jury's recommendation, the McCracken Circuit Court directed that Sutton's assault sentence run consecutively to the remaining sentences which were to be run concurrently, for a total of thirty-five years' imprisonment. On appeal,

---

[1] After the events of February 11, 2018, Jennifer Davis married Troy Risley, the victim of Sutton's assault. For clarity, we will refer to Jennifer by the name Davis rather than her new married name Risley in this Opinion.

Sutton claims the trial court committed five errors. First, the trial court erred by not granting a directed verdict on the burglary charge relating to Davis's trailer. Second, in the alternative, the trial court erred in not providing the jury a mistake of fact instruction as to the burglary of Davis's trailer. Third, the trial court erred in its failure to grant Sutton's request for a self-protection instruction. Fourth, the trial court erred in permitting the jury to view the first arriving officer's body camera video of the scene. Lastly, the court erred in denying Sutton's motion for a mistrial on sentencing based on the jury changing its initial verdict that all the sentences run concurrently, to one running the assault consecutively to the remaining sentences. For the following reasons, we affirm the McCracken Circuit Court.

## I. FACTS

On February 11, 2018, Sutton initiated a violent home invasion of Davis's residence during which he shot her new boyfriend, Troy Risley. A McCracken County grand jury indicted Sutton for first-degree assault of Risley; attempted murder of Risley; attempted murder of Davis; four counts of wanton endangerment of the children present; first-degree burglary of Davis's residence; first-degree burglary of the landlord, Norman Burkey's residence; receiving stolen property valued at $10,000 or more for being in possession of a stolen truck; four counts of theft by unlawful taking of firearms from Burkey's residence; theft by unlawful taking of property valued at more than $500 for stealing money from Burkey's residence; two counts of possession of a firearm by a convicted felon; two counts of possession of a handgun by a convicted

2

felon; theft by unlawful taking of property valued at $500 or more for stealing an automobile; and theft by unlawful taking of property valued at less than $500 for stealing gasoline from a convenience store. Before trial, the Commonwealth elected to proceed on the first-degree assault of Risley and moved to dismiss the count of attempted murder as to Risley. The prosecutor also moved to dismiss the count of receiving stolen property relating to the stolen truck and elected to proceed on a single count of theft by unlawful taking of a firearm for the theft from Burkey's residence. On agreed motion, the parties moved to sever the four counts relating to possession of firearms and a handgun by a convicted felon. The trial court granted these requests and the trial proceeded on the charges of first-degree assault of Risley, attempted murder of Davis, four counts of wanton endangerment, first-degree burglary of Davis's trailer, first-degree burglary of Burkey's home, theft by unlawful taking of the firearms, theft by unlawful taking of property valued at $500 or more for the automobile, and theft by unlawful taking of property valued at less than $500 for stealing gasoline.

Trial testimony revealed the following: Sutton and Davis met in June 2017, and shortly thereafter, he moved in with her and her three children, T.J., A.D., and Y.K.[2] That July, they moved into a trailer on Gordon Drive in Kevil, Kentucky. The landlord, Norman Burkey, agreed to let them live rent-free in the trailer for a year on Sutton's promise to make improvements on the trailer. Burkey lived across a creek from the trailer. Sutton testified that Davis did not

---

[2] To preserve the privacy of the minor children, we will use their initials.

allow him to drink or use drugs, something Sutton stated he needed "in his life at the time."

In November 2017, Sutton took Davis's car, went out drinking and fell asleep at a friend's house in Illinois. Davis was angry, and Sutton stated they nearly split up, but Davis gave him another chance. Davis's recounting of the event included Sutton moving out briefly in November and only returning after Sutton told her he had nowhere else to go. She permitted his return in December 2017. However, Davis testified that on Sutton's return they did not resume a romantic relationship, and Sutton moved out again shortly after returning. Davis testified that Sutton took his belongings, leaving behind only a couple of pairs of jeans and a shirt. Sutton claimed the opposite, that he only took two pairs of pants and a shirt and left everything else behind.

On the stand, Sutton stated he left because Davis cheated on him and claimed to have no money when he left. Sutton was arrested in Kansas shortly after his departure from Kentucky for stealing gasoline, resulting in his spending ten days in jail. The day after his release, Sutton said he found a job in construction in Kansas. Both Sutton and Davis testified they spoke daily, or almost daily, while Sutton was in Kansas. Sutton tried to persuade her to move to Kansas, but she refused and stated she was unwilling to uproot her children. Davis testified that during one of their conversations, Sutton told her that just before he left, he had stood over her with a lead pipe as she slept and had considered killing her but did not want to wake the children. Davis testified that Sutton told her that "if he couldn't have her, no one could," a

4

phrase he repeated on more than one occasion, according to Davis. Sutton denied making those statements, testifying that he loved Davis too much to tell her that.

Davis began dating Troy Risley within a month of Sutton's leaving. Risley began staying at the trailer a couple of days before the incident in question. Risley testified that Davis had told him about Sutton and that he knew Davis was communicating with Sutton. Davis testified she never told Sutton of Risley, and Sutton testified he was unaware of Davis's relationship with Risley.

The parties' testimony conflicted as to why Sutton returned to Kentucky. Sutton claimed he returned to help Davis because he believed she was struggling financially. To support this point, Sutton testified Davis told him she would sleep with the landlord, Burkey, to pay the rent. Davis denied that she told Sutton this or ever considered doing it. During his testimony, Burkey said that he wintered in Florida and was not in Kentucky during the period in question. Burkey stated he went to Florida in November 2017 and would usually have returned in mid-March if not for the break-in. The Commonwealth introduced testimony from Stacy Hines, another ex-girlfriend of Sutton, that Sutton called her shortly after the events of February 11, 2018. She claimed Sutton told her he shot a man and had done so because when he called Davis's phone from a number Sutton usually did not use, a man answered and cursed at Sutton.

Regardless of the reason, Sutton returned to Kentucky on February 11, 2018. That night, Davis, Risley, her three children, and a friend of the children,

K.B., watched a movie in the trailer's living room. Davis's daughter, A.D., sat on one end of the couch, Risley sat next to her, and Davis on the other side of Risley. Davis's son, T.J., and their guest, K.B., lay on the floor while Davis's youngest son, Y.K., was asleep on a chair. All the witnesses indicated that the only significant light source in the room was the television.

Sutton testified that when he arrived in the neighborhood, he first went to the trailer, looked in the window, and saw Davis sitting on a man's lap in the dark. Sutton claimed to believe the man was Burkey, and that sent him into a rage. Sutton testified, "I saw red." Sutton stated that at this point, he went to Burkey's house to vandalize it. Sutton broke in and began rummaging through drawers and closets in an effort to destroy Burkey's property but denied that he was looking for anything specific. However, while in the home, Sutton discovered guns and beer and admitted that he took Burkey's beer, shotgun, rifle, and ammunition. He put the shotgun, rifle, and ammunition into the back of the pickup truck he had driven from Kansas. Sutton also took Burkey's .357 revolver from the house, but he denied taking it intentionally. Instead, he stated it fell from a case of beer that he was loading into the pickup. Burkey testified, on the other hand, that the revolver was stored in its holster in the closet, a holster found by investigators on Burkey's bed inside the ransacked house. Burkey also testified that about $600 had been removed from an envelope he kept hidden in his freezer. Sutton denied taking any money from Burkey's residence.

6

After placing the items in his truck, Sutton walked to Davis's trailer with the revolver in his hand. Sutton forced his way through the trailer's front door, striking the door twice. The Commonwealth introduced photographs of the door showing that it was forced open with such violence that the top hinge was broken, as was the lock's strike plate. Witnesses stated, and Sutton admitted, he came through the open door with the .357 in his hand. Risley stated that he started to rise from the couch, and Sutton shot him twice. The first round struck Risley in the face and the second in his left elbow.

In addition to Davis and Risley, the three older children each testified. Davis and K.B. testified that Sutton waved the gun around the room toward everyone. The children all agreed that after shooting Risley, Sutton pointed the gun at Davis. Davis testified that in the moments after Sutton shot Risley, she was on her knees, with her face down in a chair and with Sutton pointing the gun at her head. She and the children begged Sutton not to shoot. K.B. testified that Sutton's index finger moved as though he was trying to pull the trigger, while T.J. and A.D. testified that Sutton actually pulled the trigger. For whatever reason, the gun did not fire, and Sutton let Davis get up.

Sutton admitted during his testimony that he pointed the gun at Risley's face and shot him twice. He denied that he pointed the gun at anyone else or that he forced Davis to her knees. Sutton claimed that once he realized the children were present, he lowered the gun and walked out. Sutton returned to the truck in Burkey's driveway and backed up at a high rate of speed, losing control and getting stuck in a muddy field across the street. He abandoned the

7

truck, leaving the rifle, shotgun, and beer inside, and fled through the fields. Less than a mile away on Sunrise Drive, he stole a car from a residence and drove toward Illinois. During the drive, he stopped at a convenience store, put gasoline in the car, and drove off without paying for the gasoline.

Sutton fled to Stacy Hines's home in Karnak, Illinois. The McCracken Sheriff's Department alerted the Illinois State Police of his possible location. The Illinois State Police spotted the stolen car at Hines's residence and observed it until they saw Sutton leave. Once Sutton left, the Illinois State Police initiated a felony stop and arrested Sutton as he drove away in the stolen car. Burkey's .357 revolver and the cash were never recovered. Sutton denied that he took the cash and claimed to have thrown the gun under Burkey's house after the shooting. However, Hines testified Sutton told her he threw it into a lake.

Doctors testified that the gunshot wound to Risley's face endangered his life, and the wound to Risley's elbow resulted in multiple surgeries and months of physical therapy. The elbow wound left him with limited function in his left arm, and his doctor testified that Risley would require additional surgery and long-term therapy, but the resulting nerve damage is likely permanent and would impair his arm function.

At the close of the Commonwealth's proof, and at the close of all proof, defense counsel moved for directed verdicts as to the assault, attempted murder, first-degree wanton endangerment, burglary of Davis's trailer, burglary of Burkey's home, and the theft by unlawful taking of the firearms, gasoline,

8

and car. The trial court rejected both motions stating that viewing the evidence in the light most favorable to the Commonwealth, the Commonwealth had presented sufficient evidence of all the charges to constitute a question for the jury. Before instructing the jury, the trial court provided copies of the proposed instructions to both parties. The trial court noted they were essentially the Commonwealth's proposed instructions, modified to add an extreme emotional distress element to the first-degree assault instruction. The court then asked if there were any objections or requested changes.

The Commonwealth asked for the wanton endangerment instruction for Davis and A.D. to be modified to permit the jury to find guilt due to the proximity of Davis and A.D. to Risley when Sutton fired. Sutton's defense counsel had no objection to this request. Sutton's counsel then, for the record, made a general objection to the instructions and specifically requested a self-protection instruction be added to the first-degree assault instruction. The trial court questioned Sutton's basis for including the instruction, and defense counsel stated a reasonable juror could find based on Sutton's testimony that Risley came toward Sutton and Sutton's actions were in self-defense. The Commonwealth objected, stating Sutton was the initial aggressor and was not entitled to a self-protection instruction. The court said, "I am not going to give that instruction," without any additional explanation.

Defense counsel then asked for a mistake of fact instruction to be added to the first-degree burglary instruction of Davis's trailer. Counsel argued that the evidence supported an inference that Sutton had reason to believe he was

9

not unlawfully present in the trailer. Defense counsel emphasized that there was confusion about the state of the relationship between Sutton and Davis and whether Sutton was entitled to be in the trailer. The court noted that the actual burglary instruction already required the Commonwealth to prove beyond a reasonable doubt that Sutton "knew that he did not have such permission" to be in the trailer. Counsel argued this was not adequate, that the existence of the mistake of fact statute is evidence that simply having "knowledge" as part of the principal instruction is insufficient. The Commonwealth stated it could find no cases where the mistake of fact instruction is added when it duplicated an element of the offense. The court agreed with the Commonwealth, stating it had conducted its own research on the question and found no case law requiring the separate instruction when it is duplicative. The court then said the requested instruction would be duplicative of Subsection B of the first-degree burglary instruction which required the jury to find that when Sutton entered the trailer, "he knew he did not have such permission[,]" and declined to add specific mistake of fact language.

The jury rejected Sutton's mitigating defense of extreme emotional disturbance and found him guilty of first-degree assault of Risley; attempted murder of Davis; first-degree wanton endangerment of A.D.; first-degree burglary of Davis's residence; first-degree burglary of Burkey's residence; theft by unlawful taking of Burkey's firearms; theft by unlawful taking of property valued at more than $500 in the theft of the car; theft by unlawful taking of

10

property valued at less than $500 in the theft of gasoline; and the lesser included offenses of menacing as to T.J., K.B., and Y.K.

During the misdemeanor penalty phase, the jury imposed the maximum penalties for the misdemeanor offenses. During the felony penalty phase, the Commonwealth introduced evidence that Sutton was previously convicted of theft by unlawful taking of property valued at more than $500 and second-degree arson. The jury fixed his penalties at twenty years' imprisonment for first-degree assault; fifteen years' imprisonment for attempted murder; five years' imprisonment for first-degree wanton endangerment; ten years' imprisonment for each of the two first-degree burglary counts; five years' imprisonment for theft by unlawful taking of the firearms; and two years' imprisonment for theft by unlawful taking of the automobile. When the trial court read the jury's verdict about whether the sentences should run concurrently or consecutively, it noted an error in how the jury had completed the verdict form.

Verdict Form 8 gave the jury three choices: (1) run the sentences concurrently; (2) run the sentences consecutively; or (3) run some sentences concurrently and some sentences consecutively. The form itself had blanks in each of the options where the jury was to write in the instruction numbers to which it was to apply. When the jury returned with their initial verdict, they had put a checkmark in the blank for concurrently contained in option 1 rather than writing in the instruction numbers. The trial court stated, "I think I know what you want," but asked the jury to return to the jury room and "fill in

11

the instruction numbers as well."[3] Defense counsel did not object to the court's direction to the jury. When the jury returned approximately ten minutes later, the checkmark had been scratched out, and the blanks for the combination of consecutive and concurrent sentences (option 3) had been completed. The resulting recommendation ran the assault sentence (Instruction 2) consecutively to the remaining sentences for a total of thirty-five years' imprisonment. The trial court asked the parties if they would like the jury polled.

Defense counsel asked to approach and made a motion for a mistrial as to sentencing. Counsel argued there were reasonable grounds to believe that the jurors were confused on what they decided, and it was reasonable to construe they had initially recommended a total of twenty years' imprisonment for all charges. Defense counsel further argued that the change in recommendation after the jury was sent back showed a structural issue with the verdict. The trial court deferred the ruling on this motion, instead again asking defense counsel whether he wanted the jury polled. The court stated it would take up the mistrial motion after it had dismissed the jury. Defense counsel asked for the jury to be polled, and all jury members acknowledged the verdict as their verdict.

---

[3] We note that a review of the video record shows the trial court made no expression of what it thought the jury meant by its verdict or any indication that a concurrent sentence would be an incorrect result. It only stated that the jury had to return to the jury room and fill in the spaces correctly.

Once the jury was excused, the court addressed Sutton's motion for a mistrial on sentencing. The Court stated for the record that the original jury form was incomplete. The jury had placed a checkmark in the blank where the instruction numbers were supposed to be written rather than the numbers themselves. When the jury came back, that mark was crossed out and a checkmark was placed next to the third subparagraph and the blanks were filled in with Instructions 3–8 to run concurrently, and Instruction 2, assault, to run consecutively with the other sentences for a total of thirty-five years' imprisonment. The court noted it was not the first-time jurors had had difficulty filling in that form correctly. The Commonwealth objected to any mistrial, emphasizing the jury was polled and all jurors agreed the verdict was their verdict. The trial court denied the motion for mistrial.

Sutton now appeals his convictions as a matter of right. KY. CONST. § 110. Sutton argues: (1) he was entitled to a directed verdict for the burglary charge for Davis's trailer; (2) the trial court erred by not including a mistake of fact instruction as to the burglary of Davis's trailer; (3) the trial court erred in denying Sutton's request for a self-protection instruction; (4) the trial court erred by permitting the jury to view body camera video of the scene; and (5) the trial court erred in permitting the jury to correct the error in its sentence recommendation on Verdict Form 8.

13

## II. ANALYSIS

### A. Sutton was not entitled to a directed verdict on the charge of first-degree burglary of Davis's trailer.

Sutton argues that the Commonwealth failed to prove each element of the burglary count regarding Davis's trailer. Therefore, the trial court committed reversible error in denying his directed verdict motion. The Commonwealth asserts that the issue is not properly preserved. Specifically, the Commonwealth argues Sutton's failure to object to the giving of the burglary instruction waived the issue. We recently clarified the process required to preserve a directed verdict issue. *Ray v. Commonwealth*, 611 S.W.3d 250 (Ky. 2020), *petition for cert. filed*, No. 20-8236 (U.S. Jan. 29. 2021). In *Ray*, we held that jury instruction issues and directed verdict issues are distinct for purposes of appeal. *Id.* at 266. A criminal defendant may preserve a directed verdict issue for appeal by:

> (1) mov[ing] for a directed verdict at the close of the Commonwealth's evidence; (2) renew[ing] the same directed verdict motion at the close of all the evidence, unless the defendant does not present any evidence; and identify[ing] the particular charge the Commonwealth failed to prove, and [identifying] the particular elements of that charge the Commonwealth failed to prove.

*Id.* The record shows Sutton made the appropriate directed verdict motion on the burglary count at the conclusion of the Commonwealth's presentation of its evidence, and he renewed that motion at the conclusion of his own evidence. Therefore, the issue is preserved.[4]

---

[4] We note that we rendered *Ray* six days after the Commonwealth submitted its brief in this case. Therefore, our clarification on the rules of preservation contained in *Ray* were unavailable to the Commonwealth.

14

The standard of review for denial of a motion for directed verdict is as follows:

> On motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.
>
> On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.

*Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991). Under KRS 511.020(1):

> A person is guilty of burglary in the first degree when, with the intent to commit a crime, he knowingly enters or remains unlawfully in a building, and when in effecting entry or while in the building or in the immediate flight therefrom, he or another participant in the crime:
>
> (a) Is armed with explosives or a deadly weapon; or
>
> (b) Causes physical injury to any person who is not a participant in the crime; or
>
> (c) Uses or threatens the use of a dangerous instrument against any person who is not a participant

Furthermore, KRS 511.090(1) provides that "[a] person 'enters or remains unlawfully' in or upon premises when he is not privileged or licensed to do so." With these rules in mind, we now address the trial court's denial of Sutton's directed verdict motion.

15

Sutton argues the Commonwealth failed to introduce evidence that he did not have permission to enter the trailer. Admittedly, both parties acknowledge that Sutton was once a tenant in the trailer. While his status as a former tenant may provide Sutton some credibility on this issue, the question on a directed verdict motion is not necessarily what evidence supporting the defendant was solicited, but rather what evidence the Commonwealth produced in support of its burden of proof. The Commonwealth established that Sutton had moved out and lived in Kansas until the day of the attack. While evidence indicated he had moved out on at least one prior occasion and returned to the trailer, Davis's testimony was that Sutton had requested permission to return on that prior occasion. Davis and Sutton both testified that while they communicated after Sutton's move to Kansas, Sutton's goal was to convince Davis to move to Kansas. There was no testimony that Sutton asked to return, or made known an intention to return, to Kentucky. Lastly, and perhaps most importantly, he did not use his key to open the door when he returned. Sutton burst through the door with such violence that he broke one of the hinges and the strike plate on the latch and did so while holding a .357 revolver. Viewing the evidence in the light most favorable to the Commonwealth, we hold that it was not clearly unreasonable for a jury to find that Sutton was guilty of burglary. Therefore, the trial court did not err in denying Sutton's motion for a directed verdict as to the burglary of Davis's trailer.

**B. The trial court did not err in finding a specific mistake of fact instruction would be duplicative of the court's proposed instruction.**

Sutton's second argument on appeal is that he was entitled to a mistake of fact instruction as part of the jury instruction regarding the burglary of Davis's trailer. A trial court is required to instruct on "every state of the case deducible or supported to any extent by the testimony." *Taylor v. Commonwealth*, 995 S.W.2d 355, 360 (Ky. 1999) (citing RCr[5] 9.54(1); *Kelly v. Commonwealth*, 267 S.W.2d 536, 539 (Ky. 1954)). Whether the evidence warranted a requested instruction is viewed in the light most favorable to the requesting party. *Thomas v. Commonwealth*, 170 S.W.3d 343, 347 (Ky. 2005) (citing *Ruehl v. Houchin*, 387 S.W.2d 597, 599 (Ky. 1965)). "A decision to give or to decline to give a particular jury instruction inherently requires complete familiarity with the factual and evidentiary subtleties of the case that are best understood by the judge overseeing the trial from the bench in the courtroom." *Sargent v. Shaffer*, 467 S.W.3d 198, 203 (Ky. 2015). Ordinarily, "[b]ecause such decisions are necessarily based upon the evidence presented at the trial, the trial judge's superior view of that evidence warrants a measure of deference from appellate courts that is reflected in the abuse of discretion standard." *Id.* (footnote omitted).

However, in this case, the trial court seemed to agree that Sutton had presented sufficient evidence to warrant a mistake of fact instruction. The trial court's actual decision was that the its contemplated instruction for burglary,

---

[5] Kentucky Rules of Criminal Procedure.

17

which already included a "knowing" element, permitted Sutton's argument and that Sutton's proposed separate mistake of fact instruction would be duplicative. Because the trial court's decision on this issue was not based on its assessment of the facts but rather its assessment of the law, we review the trial court's denial of the requested jury instruction in this case de novo. *Conyers v. Commonwealth*, 530 S.W.3d 413, 424 (Ky. 2017) (citing *Sargent*, 467 S.W.3d at 204). We examine jury instructions in their entirety, and where the instruction accurately states the law there is no error. *Fields v. Commonwealth*, 274 S.W.3d 375, 415 (Ky. 2008) (citing *Bills v. Commonwealth*, 851 S.W.2d 466, 471 (Ky. 1993)), *overruled on other grounds by Childers v. Commonwealth*, 332 S.W.3d 64 (Ky. 2010). Jury instructions should not explain evidentiary matters, evidentiary presumptions, or contain unnecessary detail. *Meyers v. Chapman Printing Co., Inc.*, 840 S.W.2d 814, 824 (Ky. 1992). Erroneous instructions to the jury are presumed to be prejudicial, and an appellee claiming harmless error bears the burden of showing affirmatively that no prejudice resulted from the error. *Sargent*, 467 S.W.3d at 212 (citing *McKinney v. Heisel*, 947 S.W.2d 32, 35 (Ky. 1997)).

Sutton relies on *Cheser v. Commonwealth* for the proposition that even when the general instruction addresses the requisite mental state, a specific mistake of fact instruction must be given if the evidence supports it. 904 S.W.2d 239, 243 (Ky. App. 1994), *overruled on other grounds by Walker v. Commonwealth*, 127 S.W.3d 596 (Ky. 2004). We acknowledge a trial court is required to instruct the jury on affirmative defenses if the evidence would

18

permit a juror reasonably to conclude that the defense exists. *Fredline v. Commonwealth*, 241 S.W.3d 793, 797 (Ky. 2007); *Nichols v. Commonwealth*, 142 S.W.3d 683, 687 (Ky. 2004). A mistake of fact instruction is only justified if: (1) evidence is presented at trial that would allow the jury to infer that the defendant's actions resulted from a reasonable and bona fide mistake of fact; and (2) the mistake negates the applicable mental state of the charged offense. *Cheser*, 904 S.W.2d at 242. "[M]istake of fact is governed by a subjective standard and there is no requirement to show that a mistake of fact be reasonable for this defense to be available." *Mullikan v. Commonwealth*, 341 S.W.3d 99, 107 (Ky. 2011) (citing *Walker*, 127 S.W.3d at 608; KRS 501.070).

The Commonwealth agreed that it bore the burden of proving that Sutton entered Davis's trailer knowing that he did not have permission to be there. When Sutton's counsel requested the mistake of fact instruction, the trial court asked whether Subsection B of the proposed instruction did not already provide for that mistake, as it required the Commonwealth to prove beyond a reasonable doubt Sutton knew he was in the trailer unlawfully. Jury Instruction 23 dealt with the first-degree burglary of Davis's trailer on Gordon Drive. The instruction in its entirety read:

> You will find the Defendant, Shawn K. Sutton, guilty of First-Degree Burglary under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:
>
> A. That in this county on or about February 11, 2019 and before the finding of the Indictment herein he entered or remained in a building (4420 Gordon Drive) rented by Jennifer Davis without the permission of Jennifer Davis or any other person authorized to give such permission;

19

B. That in so doing, **he knew he did not have such permission**;

C. That he did so with the intention of committing a crime therein;

AND

D. That when effecting entry or while in the building or in immediate flight therefrom, caused physical injury to Troy Risley, and Troy Risley was not a participant in the crime.

If you find the Defendant guilty under this Instruction you shall not fix his punishment but shall state only in your verdict that you have found the Defendant guilty of this offense and return your verdict to the Court without deliberating on the question of punishment.

(emphasis added).

The Commonwealth agreed with the court that the tendered instruction already permitted Sutton's argument, and a mistake of fact instruction would be duplicative of the language already contained in the burglary instruction.

KRS 501.070, in pertinent part, provides, "(1) A person's ignorance or mistake as to a matter of fact or law does not relieve him of criminal liability unless: (a) Such ignorance or mistake negatives the existence of the culpable mental state required for commission of an offense . . . ." As noted above, knowledge was a necessary element of the offense. The general rule is that where the general instructions are "couched in such language as the ordinary layman, who sits upon the jury, can easily and readily understand and comprehend, and its negative completely and adequately covers the defense of the accused, it is unnecessary to give an affirmative instruction on the theory."

20

*Duvall v. Commonwealth*, 225 Ky. 827, 10 S.W.2d 279, 281 (1928).[6] Sutton

relies on *Cheser*'s statement that where a mistake of fact defense negates the

existence of a statutorily required mental state, it is an abuse of discretion for a

trial court not to give this instruction. 904 S.W.2d at 242. "[W]here a defendant

proves facts or circumstances to excuse his or her act which would otherwise

in and of itself be a crime, or the specific issue is one of criminal intent such as

mental capacity, an affirmative instruction should be given." *Id.* (citing *Grigsby*

*v. Commonwealth*, 299 Ky. 721, 187 S.W.2d 259, 261 (1945)).

  *Cheser* was a Court of Appeals decision, and we have not directly

addressed whether a general instruction may sufficiently address a defendant's

viable statutory mistake of fact defense. States are divided on whether a

general instruction, adequately addressing the defendant's culpable mental

state, can sufficiently express a defense of mistake of fact.[7] We have said it is

---

[6] *See also Stafford v. Commonwealth*, 490 S.W.2d 738, 741 (Ky. 1973); *Owens v. Commonwealth*, 487 S.W.2d 897, 900 (Ky. 1972), *overruled on other grounds by Commonwealth v. Roberts*, 122 S.W.3d 524 (Ky. 2003).

[7] *See People v. Ellison*, 466 N.E.2d 1024 (Ill. App. 1984) (rejecting state's claim that general jury instruction on elements of theft and burglary were sufficient when a mistake of fact has been adequately raised); *State v. Freeman*, 267 N.W.2d 69 (Iowa 1978) (holding courts have a duty to specifically instruct on a mistake of fact even where requisite criminal intent is part of the general instruction); *General v. State*, 789 A.2d 102 (Md. 2002) (holding the general instruction on intent is insufficient when a mistake of fact defense is supported by the evidence); *Scott v. State*, 44 So. 803 (Miss. 1907) (holding the instruction setting forth the elements of the crime must be modified to incorporate the affirmative defense when the affirmative defense is supported by evidence); *Commonwealth v. Hamilton*, 766 A.2d 874 (Pa. 2001); *Hill v. State*, 765 S.W.2d 794 (Tx. Crim. App. 1989); *Stagner v. State*, 842 P.2d 520 (Wy. 1992) (holding general instruction was inadequate where sufficient evidence was asserted justifying mistake of fact instruction); *but see, e.g., State v. Singleton*, 974 A.2d 679 (Conn. 2009) (holding separate jury instruction not required when instruction on the intent is sufficient to permit the defendant's defense); *Murray v. State*, 782 S.E.2d 694 (Ga. App. 2016) (holding separate mistake of fact instruction is not required where instructions as a whole fairly present the defendant's defense); *Palmer-Hall v. State*,

error for a trial court to refuse to provide a voluntary intoxication instruction when the evidence justified it, *Fredline v. Commonwealth*, 241 S.W.3d 793, 797 (Ky. 2007),[8] a self-protection instruction when supported by the evidence, *Hilbert v. Commonwealth*, 162 S.W.3d 921, 925 (Ky. 2005), or an innocent possession instruction when warranted, *Commonwealth v. Adkins*, 331 S.W.3d 260, 263 (Ky. 2011). We note each of these statutory defenses is qualitatively different from a mistake of fact. In each example, the defendant is acting in a way that a person would otherwise know is illegal and the Commonwealth can prove the requisite elements. However, statutes provide exceptions allowing the defendant to argue an inability to form the requisite criminal intent (intoxication), justification (self-protection), or a policy exception (innocent possession). A separate instruction in those instances is rationally required to effectively inform the jury of the exception and delineate its bounds.

"Knowing" has a much more ordinary meaning to a jury when it is assessing whether the defendant was simply wrong in his understanding of the situation, and he did not knowingly act in a proscribed manner. Kentucky has long employed the use of "bare bones" jury instructions, avoiding an abundance of detail and providing only a framework of the applicable legal principles. *Olfice, Inc. v. Wilkey*, 173 S.W.3d 226, 229 (Ky. 2005). "'Bare bones' instructions are proper if they correctly advise the jury about 'what it must

---

138 N.E.3d 968 (Ind. App. 2019) (holding mistake of fact is adequately covered by an appropriate intent instruction).

[8] *But see Fields*, 274 S.W.3d at 415 (holding that when read in its entirety, the primary instruction accurately stated the law and the effect of voluntary intoxication on the offense of intentional murder).

22

believe from the evidence in order to return a verdict in favor of the party who bears the burden of proof' on that issue." *Id.* (citing *Meyers*, 840 S.W.2d at 834).[9] "Trial courts are called upon to engage in a balancing effort to ensure that jury instructions in Kentucky provide only the bare minimum necessary to ensure that the jury understands the ultimate issue of fact to be decided in any case, but still provide enough law and background knowledge so that the jury comes to a decision that is supported by law." *Norton Healthcare, Inc. v. Disselkamp*, 600 S.W.3d 696, 723 (Ky. 2020). We have explained that the "bare bones" of the jury instruction can be "fleshed out by counsel in their closing arguments if they so desire." *Cox v. Cooper*, 510 S.W.2d 530, 535 (Ky. 1974).

Apart from *Adkins*, the cases cited by Sutton deal with a decision of a trial court as to whether to give an instruction. Only in *Adkins* did we squarely address the question of whether a specific instruction was required if the general instruction expressed the requisite mental state. 331 S.W.3d at 264. Adkins was indicted for possession with intent to distribute methamphetamine. *Id.* at 261–62. Adkins asserted an innocent possession defense based on his confiscation of the items from a third party and evidence he had tried to call police only a couple hours prior. *Id.* at 262. Adkins sought modification of the instruction related to his possession of the methamphetamine to include the word "unlawfully." *Id.* The trial court refused, finding the portion of the instruction requiring the Commonwealth to show Adkins's intent to distribute was adequate to permit his innocent possession defense. *Id.* In *Adkins*, we said

---

[9] *See also Crabtree v. Commonwealth*, 455 S.W.3d 390, 413 (Ky. 2014).

that the court's general instruction for intent was insufficient to permit Adkins's full defense and he was entitled to an affirmative instruction embodying his innocent possession defense. *Id.* at 266. Notably, while we outlined a recommended instruction that completely encompassed the innocent possession defense, we said that Adkins's request to simply add the word "unlawfully" to the possession portion of the instruction was one way to allow for the statutory defense. *Id.*[10] For this reason, where the general instruction sufficiently places the burden on the Commonwealth to prove the defendant knew his conduct was unlawful and permits the defendant to affirmatively and effectively argue his mistake of fact, a separate mistake of fact instruction is not required.

As outlined above, Subsection B of the burglary instruction already captured Sutton's mistake of fact defense. Although not as verbosely or emphatically as Sutton would have preferred, the instruction appropriately placed the burden on the Commonwealth to introduce evidence from which the jury could conclude that Sutton entered the property knowing he was doing so unlawfully. The instruction permitted Sutton to affirmatively argue the mistake as a counter to the Commonwealth's evidence. The trial court found Sutton could argue the mistake and that the argument was adequately expressed in Subparagraph B of the burglary instruction. Unlike *Adkins* where it was

---

[10] The more complete instruction outlined by this Court added the word "unlawfully" to the possession instruction and provided a specific statutory definition of "innocent possession." We note in the *Adkins* context, "innocent possession" had a very specific meaning and like self-protection or intoxication may not have lent itself to an ordinary meaning easily and readily understood by the jury.

24

reasonable to conclude the court needed to explain the legal definition of innocent possession, here the reasonable juror can understand the phrase "he knew he did not have such permission." Because the instructions permitted Sutton to place his mistake of fact defense squarely in front of the jury and the burden was on the Commonwealth to establish the requisite knowledge element, we hold that the trial court did not err in determining Sutton's offered instruction was duplicative of the court's instruction. For this reason, the court did not abuse its discretion in denying Sutton's request for a separate, specific mistake of fact instruction.

## C. The trial court did not abuse its discretion in denying Sutton's request for a self-protection instruction.

Sutton's third claim of error was the trial court's denial of a self-protection instruction. "Instructions must be based upon the evidence, and they must properly and intelligibly state the law." *Howard v. Commonwealth*, 618 S.W.2d 177, 178 (Ky. 1981) (citing *Simpson v. Commonwealth*, 313 Ky. 599, 233 S.W.2d 118, 120 (1950)). Because the trial court's denial of Sutton's request for a self-protection instruction was based on its view of the evidence, we review the decision for abuse of discretion. *Exantus v. Commonwealth*, 612 S.W.3d 871, 888 (Ky. 2020) (citing *Ratliff v. Commonwealth*, 194 S.W.3d 258, 274 (Ky. 2006)). KRS 503.050 provides that a person may use physical force, including deadly physical force, if he believes that such force is necessary to protect against death or serious physical injury by the other person. A defendant's otherwise justifiable use of physical force is improper if the defendant is the initial aggressor. KRS 503.060(3). A jury instruction on self-

25

defense "is necessary once sufficient evidence has been introduced at trial which could justify a reasonable doubt concerning the defendant's guilt." *Hilbert v. Commonwealth*, 162 S.W.3d 921, 925 (Ky. 2005) (citations omitted). We recently addressed a trial court's decision on whether to include jury instructions regarding the right to use deadly force and the initial aggressor limitation in *Downs v. Commonwealth*, 620 S.W.3d 604 (Ky. 2020). In *Downs,* we stated that:

> [W]e have made clear that there must be sufficient evidence in the record to substantiate the instruction:
>
>> The criterion is whether movant, in good faith, believed it was necessary to exercise extreme force in saving his own life. It is not every assertion of such belief that is adequate to support a plea of self-defense. It is the whole circumstances which surround the incident that must be considered by the trial judge in deciding whether an instruction on self-defense is proper or whether an instruction on self-defense with limitations is proper. We have held that before such qualifying instructions are proper there must of course be evidence to justify it. In other words, the trial judge must find as a matter of law that there is sufficient evidence to justify such limitations before instructing the jury.

*Id.* at 614 (quoting *Stepp v. Commonwealth*, 608 S.W.2d 371, 374 (Ky. 1980)). While *Downs* assessed the trial court's inclusion of an initial aggressor limitation to the self-protection instruction, *id.*, the question is the same. Is there sufficient evidence to justify the requested instruction?

In denying Sutton's request for a self-protection instruction, the trial court never stated whether it agreed with the Commonwealth's argument that the instruction was unwarranted because Sutton was the initial aggressor. The court succinctly stated, "I am not going to give that instruction." We note the

Commonwealth's initial aggressor argument for denying the instruction is an incomplete statement of law. Whether a defendant is the initial aggressor is a limiting instruction included within the self-protection instruction, not an absolute bar to a self-protection instruction. The initial aggressor limitation is added to a self-protection instruction if: (1) the facts support a self-protection instruction; and (2) there are facts that would support a juror's belief that the defendant was the initial aggressor. *See, e.g., Conley v. Commonwealth*, 599 S.W.3d 756, 775–76 (Ky. 2019). As we stated in *Downs* and *Stepp,* "[i]t is the whole circumstances which surround the incident that must be considered by the trial judge in deciding whether an instruction on self-defense is proper[.]" *Id.* Some of the same facts that support an initial aggressor instruction may also be relevant to the issue of whether the defendant had a subjective belief that deadly force was necessary in the first place.

Here, Sutton broke through the door with a .357 revolver in his hand. Risley stood up or attempted to stand up quickly from the couch. Sutton testified that Risley lifted his arm, and witnesses indicated Risley's sole action was to say, "don't do it." Sutton stated at this point, "I got scared," and shot Risley twice. Risley was across the room from Sutton at the time Sutton fired. Sutton never indicated he saw, or thought he saw, a weapon or otherwise stated that he believed that he was in danger of death or serious physical injury. A nonspecific statement of fear is insufficient; the evidence must support the defendant's belief that deadly force "is necessary to protect himself against death [or] serious physical injury." KRS 503.050(2). Thus, even fully

27

accepting Sutton's version of events, none of Risley's actions, or Sutton's statements, indicate a subjective fear by Sutton **necessitating the use of deadly force** sufficient to find the trial court acted in a way that was arbitrary, unreasonable, unfair, or unsupported by sound legal principles in denying the instruction. We hold the trial court did not abuse its discretion by denying a self-protection jury instruction.

### D. The trial court did not abuse its discretion in permitting the jury to view the body camera video.

Sutton next argues the trial court erred in permitting the jury to view the body camera video from the first officer to arrive on the scene. The video was played during the officer's testimony to support his commentary. The entire video was approximately five minutes, about half of which was the officer applying first aid to Risley. Lastly, the low level of light in the trailer resulted in a video that was subdued and lacking in detail.[11]

"A trial judge's decision with respect to the relevancy of evidence under KRE 401 and 403 is reviewed under an abuse of discretion standard." *Love v. Commonwealth*, 55 S.W.3d 816, 822 (Ky. 2001) (citations omitted). Evidence is relevant if it has any tendency to render the existence of any consequential fact more or less probable, however slight that tendency may be. *Springer v. Commonwealth*, 998 S.W.2d 439, 449 (Ky. 1999); KRE 401. KRE 403 limits the admission of otherwise relevant evidence if the "probative value is substantially

---

[11] As discussed, the video itself was not introduced as an exhibit. Therefore, our review of the video was limited to the version captured as part of the trial's video record. It is possible we did not see the images at the same fidelity as the jury viewed them.

28

outweighed by the danger of undue prejudice." The admission of videos and photographs is subject to the balancing test of KRE 403. *Hall v. Commonwealth*, 468 S.W.3d 814, 823 (Ky. 2015).

"[A] photograph, otherwise admissible, does not become inadmissible simply because it is gruesome and the crime is heinous." *Funk v. Commonwealth*, 842 S.W.2d 476, 479 (Ky. 1992). When ruling on the admissibility of a gruesome photograph, the trial court should consider whether there are alternatives that would prove the fact at issue without comparable risk of prejudice. *Old Chief v. United States*, 519 U.S. 172, 184–85 (1997); *Norris v. Commonwealth*, 89 S.W.3d 411, 416 (Ky. 2002); *Fields v. Commonwealth,* 12 S.W.3d 275, 279 (Ky. 2000) (affirming admission of graphic crime scene video detailing victim's wounds if "proper foundation is laid"). However, the evidence must be **highly inflammatory and prejudicial** to compel a party to employ an alternative. *Ratliff v. Commonwealth*, 194 S.W.3d 258, 271 (Ky. 2006) (emphasis added).

Sutton argues the introduction of the video was needlessly cumulative of other testimony, designed to evoke bias and sympathy from the jurors, and compares the video in this case to the photographs we said should have been excluded in *Hall.* The Commonwealth, in *Hall*, introduced a ten-minute police video documenting the crime scene and a total of forty-three crime scene and autopsy photographs. 468 S.W.3d at 820. Twenty-eight of the photos were admitted over objection. *Id.* We acknowledged that admission of photos to establish the elements of the offense and the devastating nature of the victims'

29

wounds was allowed, but the Commonwealth's introduction of twenty-eight photos, over the defendant's objection, was needlessly cumulative when balanced against the danger of inflaming the jury. *Id.* at 826. We found particularly problematic the extended presentation of two enlarged images of one of the victim's wounds. *Id.* We stated that *Hall* represented "the **rare instance** of an abuse of the trial court's discretion under Rule 403 in admitting gruesome photographs." *Id.* at 827 (emphasis added).

The Commonwealth contends the video in question was relevant on its own and was not unnecessarily cumulative of subsequent witness testimony. We agree. A crime scene video is admissible even if gruesome, *Young v. Commonwealth*, 50 S.W.3d 148, 169 (Ky. 2001), and may represent a more accurate depiction of the scene than testimony alone. *Baumia v. Commonwealth*, 402 S.W.3d 530, 542–43 (Ky. 2013). The video provided the jury a pictorial representation of the layout of the room in which the events occurred, helping it understand subsequent witness testimony as well as providing the only visual evidence of Risley's injuries.

Unlike in *Hall*, except for one screenshot,[12] the video itself was not introduced as an exhibit. Therefore, the video was not available to the jury during deliberations. The video itself appeared much less gruesome than the video described in *Rucker* which we held was appropriately admitted. While the

_____

[12] A single frame capture from the video was introduced as an exhibit. The image showed the chair that Davis would later testify she was kneeling against when Sutton held the gun to her head. There was no objection to the introduction of this single image.

video was undoubtedly prejudicial to Sutton's case, as any relevant evidence would be, it was not so highly inflammatory or prejudicial as to be one of the rare instances compelling the Commonwealth to use an alternative. Therefore, we hold the trial court did not abuse its discretion in denying Sutton's motion to exclude the presentation of the video.

**E. The trial court did not err in permitting the jury to correct a mistake in form on Verdict Form 8 or imposing a thirty-five-year sentence.**

Sutton's final allegation is that the trial court erred in denying his mistrial motion as to the sentencing phase of his trial, or in the alternative, in accepting the jury's thirty-five-year sentence recommendation. Sutton's basis for his sentencing issues revolves around the jury's recommendation that Sutton's assault sentence run consecutively to his other sentences. Sutton asserts the change represented a substantive change to the verdict, a structural error amounting to manifest injustice, and a judicial infringement on Sutton's Sixth Amendment right to a trial by jury.[13] At trial, Sutton moved for a mistrial as to sentencing, but to this Court he requests relief in the form of reversing and remanding the sentencing with an order to impose a twenty-year maximum sentence.

As noted previously, when the jury returned from sentencing deliberations, the judge detected an error in how the jury completed Verdict Form 8, the jury's recommendation as to whether the sentences should be served concurrently or consecutively. The jury had placed a checkmark in the

---

[13] U.S. CONST. amend. VI, cl. 2.

31

blank where the instruction numbers for the sentences to be run concurrently were supposed to be listed. The trial court stated, "I think I know what you want," but asked the jury to return to the jury room and "fill in the instruction numbers as well." Defense counsel did not object to the court's direction to the jury. When the jury returned approximately ten minutes later, the checkmark had been scratched out, and the blanks for the combination of consecutive and concurrent sentences had been completed. The resulting recommendation ran the assault sentence consecutive to the remaining sentences for a total of thirty-five years' imprisonment.

For a mistrial to be granted, "the record must reveal a manifest necessity for such an action or an urgent or real necessity." *Ross v. Commonwealth*, 531 S.W.3d 471, 479 (Ky. 2017) (citing *Skaggs v. Commonwealth*, 694 S.W.2d 672, 678 (Ky. 1985)). We review a trial court's denial of a mistrial for an abuse of discretion. *Slone v. Commonwealth*, 382 S.W.3d 851, 858 (Ky. 2012) (citing *Bray v. Commonwealth*, 68 S.W.3d 375, 383 (Ky. 2002)). Where correctly instructed, if a jury returns a verdict correct in form, it may not be resubmitted to the jury for substantive change. *Jackson v. Commonwealth*, 303 Ky. 25, 196 S.W.2d 865, 866 (1946). Where the mistake is one of form, apparent on the face of the verdict, the court may point out the error and "require the jury to return a verdict consistent with the instructions." *Bush v. Commonwealth*, 839 S.W.2d 550, 556 (Ky. 1992) (quoting *Bogie v. Commonwealth*, 467 S.W.2d 767, 769 (Ky. 1971)).

Sutton relies on *Jackson,* asking us to find the verdict was substantively changed and asking we direct the trial court to impose the sentences concurrently for a sentence of twenty-years' imprisonment. In *Jackson,* the defendant pleaded guilty to warehouse breaking, an offense with a maximum five-year sentence. 196 S.W.2d at 865. Despite the plea, a jury was empaneled to conduct sentencing, and the jury agreed to a one-year sentence. *Id.* The Commonwealth's Attorney objected, stating in open court that he had an agreement with the defendant for a five-year sentence in exchange for not filing other charges he had available. *Id.* The Commonwealth's Attorney then stated that if the jury did not reconsider, he would file the charges, and the trial court permitted the jury to retire and reconsider the sentence. *Id.* The jury returned with a revised verdict imposing the five-year sentence. *Id.* We said where a properly instructed jury returns a verdict that is proper in form and substance, it is too late for reconsideration of the verdict. *Id.* at 866.

We note that *Jackson* is easily distinguishable. First, we acknowledged in *Jackson* that where the verdict is improper in form or substance, the trial court is within its authority to direct the jury to correct the form. *Id.* at 865–66. Second, the *Jackson* jury was considering the sentence for a single offense rather than recommending how the defendant should serve multiple sentences. Sutton's jury had already agreed to guilt in a prior phase, and during the sentencing phase, agreed to the individual sentences for his offenses on Verdict Forms 2–7. Verdict Form 8 dealt specifically with the jury's **recommendation** as to whether his multiple offenses should be served concurrently or

33

consecutively. Kentucky law places the authority to determine the maximum sentence for an individual offense with the jury, KRS 532.060, but vests with the trial court the final authority as to whether sentences for multiple offenses are to be served concurrently or consecutively. KRS 532.110. A jury's recommendation does not bind the trial court as to whether such sentences are to be imposed consecutively or concurrently. *See Benet v. Commonwealth*, 253 S.W.3d 528, 534 (Ky. 2008); *Swain v. Commonwealth*, 887 S.W.2d 346, 348–49 (Ky. 1994); *Dotson v. Commonwealth*, 740 S.W.2d 930, 931 (Ky. 1987).

Reviewing the record, the trial court immediately recognized an error in either form or substance on Verdict Form 8. The trial court directed the jury to return to the jury room to make appropriate corrections to the form. We detected nothing in the trial court's direction that would have swayed a jury to change anything to which they had previously agreed. The jury was gone a total of approximately ten minutes to correct the form. Most importantly, nothing in the original, or corrected, version of the form was binding on the trial court. Accordingly, there was no manifest need for a mistrial, and the trial court did not abuse its discretion in denying Sutton's motion for a mistrial.

Regarding Sutton's Sixth Amendment claim, as noted, the trial court provided no basis on which we could infer that it invaded the jury's province. It provided instructions to complete the form correctly, with no direction as to the substance of completing the form. Furthermore, whether the defendant serves sentences consecutively or concurrently is not the province of the jury, but a decision made by the court after a recommendation from the jury. Therefore,

the trial court did not abuse its discretion in denying Sutton's mistrial motion and the trial court was within its authority to impose a consecutive sentence for assault.

## III.  CONCLUSION

For the foregoing reasons, we affirm the McCracken Circuit Court's judgment and sentence of Shawn Sutton.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Kathleen Kallaher Schmidt
Assistant Public Advocate

Steven Nathan Goens
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

James Daryl Havey
Assistant Attorney General